**George D. BUSBEE, et al., Plaintiffs,**

v.

**William French SMITH, et al.,
Defendants,**

**William C. (Billy) Randall, Jr., et al.,
Intervenor-Defendants.**

**Civ. A. 82–0665.**

United States District Court,
District of Columbia.

July 22, 1982.

Order Aug. 24, 1982.

Memorandum Opinion Sept. 21, 1982.

Michael J. Bowers, Atty. Gen., Carol Atha Cosgrove, Sr. Asst. Atty. Gen., Mark H. Cohen, Staff Asst. Atty. Gen., Atlanta, Ga., Joseph W. Dorn, Sp. Asst. Atty. Gen., Washington, D.C., for plaintiffs.

Mark A. Posner, Paul F. Hancock, Civil Rights Div., Attys., Voting Section, Dept. of Justice, Washington, D.C., for defendants.

Frank R. Parker, Barbara Y. Phillips, Washington, D.C., Laughlin McDonald, David Walbert, Atlanta, Ga., for intervenors-defendants.

Before EDWARDS, Circuit Judge, and ROBINSON and GREEN, District Judges.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

This action was commenced by the State of Georgia pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. The State seeks a declaratory judgment from this Court that Act No. 5 of the 1981 Extraordinary Session of the Georgia General Assembly, which is the plan for reapportionment of the State's congressional districts, "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race." 42 U.S.C. § 1973c. Such a declaratory judgment is necessary for the State to implement its reapportionment plan, as the United States Attorney General refused preclearance of Act No. 5 upon his finding that the Fourth and Fifth Congressional districts created by the Georgia law violated the Voting Rights Act of 1965. *See Id.*[1]

Trial was held before this three judge court from June 28 through July 1, 1982.

1. On May 24, 1982, this Court enjoined the State of Georgia from implementing Act No. 5 in any fashion absent the requisite declaratory judgment sought in this case. The State had planned to begin implementation of its reapportionment law by opening the candidacy qualification period on May 26, 1982. Georgia unsuccessfully moved this Court, Chief Justice Warren Burger and Justice William Rehnquist for a stay of the injunction.

FINDINGS OF FACT

1. Application of 1980 Census figures to the 1972 Georgia congressional apportionment plan demonstrated that the districts delineated in the 1972 plan did not satisfy the one-person, one-vote standard of the Fourteenth Amendment to the United States Constitution. (Stipulation of Facts ¶ 3.) New districts had to be drawn to satisfy the constitutional requirement.

2. On August 13, 1981, the Governor of Georgia, George Busbee, called a special session of the Georgia General Assembly starting August 24, 1981 to consider, *inter alia,* reapportionment of Georgia's state legislative districts and congressional districts. (*Id.* ¶ 19.)

3. On September 17, 1981, the Georgia General Assembly adopted Act No. 5, Extraordinary Session 1981, providing for the reapportionment of Georgia's ten congressional districts. (*Id.* ¶ 47.) Governor Busbee approved Act No. 5 on September 22, 1981 and it became state law.

4. For each district created by Act No. 5, the total population, black population and deviation from the ideal population of 546,426 (for purposes of the one-person, one-vote requirement) are as follows:

TABLE 1.   Population of Districts Created by Act No. 5

| DISTRICT | TOTAL POPULATION | PERCENT DEVIATION | BLACK POPULATION | PERCENT BLACK |
|---|---|---|---|---|
| 1 | 541,180 | − .96 | 179,818 | 33.23 |
| 2 | 550,237 | + .69 | 200,646 | 36.47 |
| 3 | 540,865 | − 1.01 | 185,762 | 4.35 |
| 4 | 549,846 | + .62 | 116,530 | 21.19 |
| 5 | 542,592 | − .70 | 310,822 | 57.28 |
| 6 | 548,891 | + .45 | 81,937 | 14.93 |
| 7 | 545,889 | − .09 | 32,641 | 5.98 |
| 8 | 542,552 | − .70 | 191,342 | 35.27 |
| 9 | 551,773 | + .97 | 28,608 | 5.18 |
| 10 | 550,440 | + .73 | 137,351 | 24.95 |

(*Id.* ¶ 45.)

5. The 1980 total population, black population and deviation from the ideal population of each district created by the 1972 appointment, which Act No. 5 replaced, are as follows:

TABLE 2.   1980 Population of 1972 Districts.

| DISTRICT | TOTAL POPULATION | PERCENT DEVIATION | BLACK POPULATION | PERCENT BLACK |
|---|---|---|---|---|
| 1 | 527,732 | − 3.42 | 180,225 | 34.15 |
| 2 | 552,952 | − 4.29 | 192,649 | 36.83 |
| 3 | 500,941 | − 8.32 | 173,936 | 34.72 |
| 4 | 543,954 | − .45 | 150,798 | 27.72 |
| 5 | 420,474 | − 23.05 | 211,634 | 50.33 |
| 6 | 626,354 | + 14.63 | 146,991 | 23.46 |
| 7 | 605,720 | + 10.85 | 40,086 | 6.06 |
| 8 | 508,028 | − 7.03 | 156,721 | 30.84 |
| 9 | 660,892 | + 20.95 | 31,414 | 4.75 |
| 10 | 547,218 | + .14 | 181,003 | 33.07 |

6. Based on 1980 Census figures, in the Fifth Congressional district, 48% of the white population is of voting age and 52% of the black population is of voting age. However, 54% of the registered voters are white and 46% are black. (Stipulation of Facts, ¶ 50.)

7. Geographically, Act No. 5 splits Fulton County, Georgia into three congressional districts: the Fourth, the Fifth and the Sixth. DeKalb County is split between the Fourth and Fifth Districts. The cities of Atlanta, Roswell and Alpharetta are split on a north-south axis between the Fourth and Fifth Congressional districts. (Joint Ex. 23.)

8. Demographically, Act No. 5 splits into separate congressional districts cohesive neighborhoods and communities in that part of metropolitan Atlanta which lies in south Fulton and DeKalb Counties. The black population in Fulton and DeKalb Counties is concentrated in one contiguous area stretching from southwest Fulton County to south Central DeKalb County. During the past decade, the black population has increased dramatically in south Fulton and unincorporated south DeKalb Counties. Virtually all census tracts in this area displayed an increase in black population of 100 percent or more from 1970 to 1980. (Grier Trial Testimony, 532–537; Defendants' Exhibits EEE, FFF, GGG and FFFF.) The black population has not increased similarly in north Fulton and DeKalb Counties. A racial boundary line, which tracks the Southern Railroad Line and North Avenue in Fulton County and the Georgia Railroad Line in DeKalb County, separates the races in both counties on an east-west axis. (Grier Trial Testimony, 535.)

9. The racial boundary line formed by the Southern and Georgia Railroads and North Avenue, separates, in general, persons residing in rental dwellings from those in owner-occupied houses, persons who are apartment dwellers from home owners, and persons having larger families from those with smaller families. (Defendants' Exhibits AAAA, BBBB, CCCC, and DDDD; Grier Trial Testimony, 540–547.) Most of the citizens in southern Fulton and DeKalb counties share common political and social concerns on account of their race, income, educational level, housing and household size. (*Id.;* Bond Trial Testimony, 561.)

10. Furthering the cohesion of black neighborhoods is the incidence of racially polarized voting which prevails in this area. (Young Deposition, 9, 31; Bullock Trial Testimony 255, 260, 263; Fulton Deposition, 43, 200–203, 228–228; Lowe Deposition, 83–84, 226, 228–229; Holmes Deposition 79–88; Sells Deposition, 8–14, 17; Plaintiffs' Exhibit 25.) Although Andrew Young won a seat as a United States Congressman in the Fifth District in 1972 when the black population was a lower percentage than under the State's proposed congressional plan, the evidence indicates that racial polarization has increased since that time. (*Id.*)

11. Although Act No. 5 split a cohesive black community in Districts 4 and 5, it placed cohesive white communities throughout the state of Georgia into single Congressional districts. For example, the so-called "mountain counties" of North Georgia, which were described as having peculiarly unified interests and concerns, were placed together in the Ninth District. (Miller Trial Testimony, 169A.)

12. The demographics of south Fulton and DeKalb Counties were well known to members of the Georgia General Assembly in 1981. They were aware that black citizens of the same socio-economic background lived in this area. (*See* Finding ¶ 43, *infra.*) The testimony of Dr. George Grier and the exhibits prepared by him, though relying on census information not available in 1981, confirmed that which was readily apparent to the Georgia legislators at the time of the reapportionment at issue.

13. Historically, discriminatory tactics were commonly utilized by whites against blacks in the south Fulton and DeKalb area. For example, literacy tests, the poll tax, the white primary and the county unit system were employed to destroy black voting strength. (Willingham Trial Testimony, 661–663.) *See, e.g., Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963)

(Georgia's county unit system found unconstitutional). In the 1970 reapportionment of the Atlanta area, the boundary line separating Districts Five and Six was drawn to fragment the concentration of black persons residing in the area. (Hamilton Trial Testimony, 133.) The line separating Districts Five and Six also was drawn to exclude from the Fifth District the residences of black persons who were clearly recognized as potential candidates for election in the Fifth District, and to include in the Fifth District the residences of white persons who were recognizable potential candidates. The residences of Andrew Young and Maynard Jackson (black persons recognized as potential candidates) were located approximately one block from the boundary of the proposed Fifth District. (Young Deposition, 28–31; Defendants' Exhibit N(a).) The reapportionment plan was submitted to the United States Attorney General for review pursuant to Section 5 of the Voting Rights Act and on February 11, 1972, the Attorney General interposed a Section 5 objection to the plan. The objection was interposed because the Attorney General was unable to conclude "that these new boundaries will not have a discriminatory racial effect on voting by minimizing or diluting black voting strength in the Atlanta area." (Defendants' Exhibit N(a).) The congressional reapportionment plan was subsequently revised by the Georgia General Assembly in 1972, and the Attorney General granted the necessary Section 5 preclearance to the revised plan. (Defendants' Exhibit N(b).) The 1972 plan is the plan currently in effect. The aforementioned historical discriminatory practices were abandoned only when made illegal by civil rights legislation, objected to by the Department of Justice or enjoined by the Courts.

14. The reapportionment process which resulted in the enactment of Act No. 5 began with the appointment of legislature members to the House and Senate Reapportionment Committees.

15. The Chairmen of those Committees had a significant impact on the plans that were considered by the reapportionment committees, the process by which they were considered and the plans ultimately adopted.

16. Speaker of the Georgia House, Thomas Murphy, who served as floor leader for former Governor Lester Maddox, appointed Representative Joe Mack Wilson Chairman of the House Permanent Standing Committee on Legislative and Congressional Reapportionment.

17. Representative Joe Mack Wilson is a racist. Wilson uses the term "nigger" to refer to black persons. (Wall Deposition, Vol. II, 57.) He stated to one Republican member of the Reapportionment Committee that "there are some things worse than niggers and that's Republicans." (Wilson Trial Testimony, 436.) Wilson opposes legislation of benefit to blacks, which he refers to as "nigger legislation." (Wall Deposition, Vol. II, 59; Coverdell Trial Testimony, 598; Wall Deposition, Vol. I, 30; Randall Deposition, 65–66; Wilson Deposition, 122, 148; Phillips Deposition, 36; Holmes Deposition, 52–55.) His views on blacks are well known to members of the General Assembly. From the House reapportionment committee to the Conference committee, Wilson played the instrumental role in 1981 Congressional reapportionment and he was guided by the same racial attitudes throughout the reapportionment process that guided his other legislative work.

18. Representative Grace Hamilton is a black who was appointed Vice-Chairman of the House Reapportionment Committee. She was one of two blacks appointed to the nineteen member committee. (Stipulation of Facts, ¶ 9.) She was unwaivering in her support of the leadership on the powerful House Policy Committee, which is the Speaker's vehicle for obtaining the necessary votes to either pass or defeat legislation. (Elliott Deposition, 11–12, 17–18; Randall Deposition, 19.) Illustrative of her perspective, Mrs. Hamilton testified that she knew of no instances where black people had difficulty in registering or voting in the Atlanta area in the years just prior to the passage of the Voting Rights Act of

1965. (Hamilton Trial Testimony, 155.) During the 1981 Congressional reapportionment process, Mrs. Hamilton served as a pawn for the House leadership. She has been characterized as an "Aunt Jane," the female analogue to "Uncle Tom." (Holmes Deposition, 58–58a.) (*See also* Randall Deposition, 121–124.)

19. With only one other black member of the House Reapportionment Committee, black citizens did not have effective representation on the Committee.

20. The Senate reapportionment Committee was an *ad hoc* committee established just prior to the 1981 legislative session. It was chaired by State Senator Perry Hudson, who was selected by Lt. Governor Zell Miller.

21. State Senator Julian Bond, a black, was also on the six member Senate Reapportionment Committee. He was the only black member.

22. One of the first official acts of both Committees was a meeting with officials of the Voting Section in the Civil Rights Division of the United States Department of Justice, which, on behalf of the Attorney General, ultimately denied Section 5 preclearance of the Georgia reapportionment plan. (Stipulation of Facts, ¶ 10.)

23. At that meeting, the Georgia officials were informed that to comply with the Voting Rights Act, a reapportionment plan could have neither the purpose nor the effect of discriminating on account of race. Specifically, the legislators were instructed that a plan could not cause retrogression (a reduction in the percentage of black voters in a particular district) and that the legislators should not split concentration of black population. The legislators were further informed that because a larger percentage of whites vote than do blacks, for blacks to cast a majority of votes in a given election, at least 65% of the population in a district would have to be black. (Defendants' Exhibit CC, 2.)

24. Chairman of the House Reapportionment Committee Wilson denied that the Justice Department warned against splitting concentrations of blacks. (Wilson Trial Testimony, 446–47). Senator Hudson, testifying otherwise, acknowledged that the Justice Department had warned against splitting concentrations of blacks. (Hudson Trial Testimony, 358).

25. Approximately one week after the legislators' meeting with the Justice Department officials, Chairman Wilson stated at that time that he didn't know "what's going to be the outcome of this [reapportionment] because the Justice Department is trying to make us draw nigger districts and I don't want to draw nigger districts." (Hudgins Deposition, 7–8.)

26. The shared reapportionment goals of the House and Senate committees, as articulated by their respective chairmen in documents distributed to Committee members, were:

(a) all plans were to comply with the Voting Rights Act of 1965 in that they were not to be developed with the purpose or have the effect of diluting minority voting strength;

(b) all plans were to comply with the one person, one vote requirement of the Fourteenth Amendment;

(c) county units were to be maintained in constructing districts;

(d) if county lines were not maintained, district lines should follow county precinct lines to the extent possible.

(Stipulation of Facts, ¶¶ 16–17; Joint Exhibits 8, 10.)

27. The Committees held joint public hearings throughout the State of Georgia at which citizens proffered their goals for reapportionment. The minutes of the public hearings revealed that while residents of some districts indicated a desire to retain existing districts, no participant in the Atlanta public hearing asked that the Fifth Congressional district be maintained in its existing configuration. (Joint Exhibit 5-Tab 9.)

28. Dr. Clinton Warren, representative from the Atlanta NAACP, stated at the Atlanta public hearing that, in adding population to the Fifth District, the reappoint-

ment committees should remember that south Fulton County has an increasing minority population and that these persons share economic and cultural ties with the City of Atlanta. (Joint Exhibit 5, May 21, 1981, Atlanta Public Hearing, Tab 9, at 3.) Dr. Warren implied that the black communities should be included entirely within the new Fifth District. Chairman Wilson testified that the House Reapportionment Committee ignored Dr. Warren's recommendation; the Fifth District under the House passed plan split this very concentration of black population among three congressional districts. (Wilson Trial Testimony, 453–54.)

29. House Committee Chairman Wilson's stated goal, beyond the goals enumerated in the memorandum to committee members, was to keep Congressional districts in their "historical configuration", (Wilson Trial Testimony, 409); he admitted that the "historical" configurations were, in some cases, those which resulted after the 1970 apportionment. (*Id.,* 423.)

30. Representative Hamilton's chief objective was to keep the City of Atlanta intact and exclusively within the Fifth District. (Hamilton Trial Testimony, 135.) Nevertheless, she endorsed the House alternative to the Senate plan, discussed *infra,* which divided the City of Atlanta into two districts.

31. Lt. Governor Miller asserted that keeping the cohesive mountain counties together was crucial. (Miller Trial Testimony, 171.) He felt that uniting that area— where there are few blacks—was more important than keeping the cohesive black community in south Fulton and DeKalb counties together. (*Id.,* 201.)

32. Senator Hudson's goal was to maintain existing districts to the extent possible. (Hudson Trial Testimony, 334.)

33. Most of the factors which the legislative leadership identified as important were disregarded in the final apportionment plan. For example, Act No. 5 splits Gwinnett County between the Ninth and Tenth Congressional Districts and also splits the Gwinnett County municipalities of Snellville and Loganville in the same man-

ner. The Tenth District, which complied with the one-person, one-vote standard in its pre-existing configuration, now stretches from central Georgia to the Atlantic Ocean, and bears no resemblance to the pre-existing district. (Citizens at the Tenth Congressional District Public Hearing were overwhelmingly in favor of keeping their District "as it is." *See* Joint Exhibit 5, Tab 12, at 7, 9, 10.) Moreover, the reapportionment of the Tenth District did not protect Congressman Doug Bernard, as "he [lost] a great many of the counties around his home area," (Murphy Trial Testimony, 30; *see* also Murphy Deposition, 60), and a portion of predominantly Republican Gwinnett County was added to the Tenth District. Finally, DeKalb County is split between the Fourth and Fifth Districts. (Joint Exhibit 23; Defendants' Exhibit NNN.) Where compromise was necessary, the goals were ignored. (Elliott Deposition, 30–31; Felton Deposition, 38–39; Lowe Deposition, 47–48.)

34. However, in drawing the Fifth District, those goals which were realized were characterized by the leadership as inviolable, with the result that the "historical" line dividing the black community in metropolitan Atlanta was preserved. (*See, e.g.,* Wilson Trial Testimony, 450.) The committee process, floor consideration and conference committee work demonstrate that the purported inviolability of those goals was a pretext for splitting the cohesive black community in the greater Atlanta area of south Fulton and DeKalb counties.

35. The House Reapportionment Committee was divided into two subcommittees, one to consider state legislative reapportionment and the other to consider Congressional reapportionment.

36. Chairman Wilson maintained, incredibly, that he exercised absolutely no control over the proposals considered by the subcommittees or committee as a whole. (*See, e.g., id.,* 411–414.)

37. In fact, Rep. Wilson utilized the full power of his position and personality to insure passage of his desired Congressional plan.

38. At the outset of and throughout the process, Wilson threatened and cajoled legislators that if they did not support him on Congressional redistricting, the members' legislative districts might be in jeopardy. Wilson maintained at trial that since legislative redistricting was completed before Congressional reapportionment, such threats were unenforceable. Wilson overlooked that aspect of the legislative process known as "logrolling," where a legislator agrees to a future vote on behalf of another legislator who has power over a present legislative proposal. Some legislators were willing to trade their vote on Congressional redistricting to insure the configuration of their own legislative districts.

39. The Senate and House reapportionment committees agreed to complete the legislative reapportionment plans for their own bodies prior to focusing on congressional reapportionment. (Stipulation of Facts, ¶ 20.) Reapportionment of House districts proceeded on a delegation-by-delegation basis until completion of the plan. This procedure permitted Chairman Wilson to "lock-in" support for his positions for the duration of the congressional, as well as the House, reapportionment processes. (Scott Trial Testimony, 626.) According to Representative Scott:

> Whenever a delegation or a member of that [reapportionment] committee was allowed to have a significant amount of input in drawing his own district, ... he was really committed to the chairman for the duration of the reapportionment process to support the chairman's views on reapportionment positions.

(Scott Trial Testimony, 625.) Chairman Wilson actually asked legislators appearing before the committee, "If I allow you to make some changes in your district, are you going to be with me?" (*Id.*) The commitments Chairman Wilson obtained during the reapportionment of the House, in fact, translated into votes for his position on congressional reapportionment.

40. Representative Auten noted that some legislators had voted for or against reapportionment plans because "the leadership of the House or the leadership of the Senate told them to... Fear of losing your district line has been an agenda of the day. I'm afraid I'm going to get hurt if I don't vote for it you tell me." (Joint Exhibit 16 at 194.) In light of this public testimony from the well of the House, Chairman Wilson's trial testimony that threats were not used to secure votes for the conference committee plans is incredulous. (Wilson Trial Testimony, 434–35.)

41. The General Assembly received technical assistance in developing congressional and legislative reapportionment plans from the Reapportionment Services Unit. The Reapportionment Unit is a separate unit of the Institute of Government at the University of Georgia,. and operates under a contract with the General Assembly. (Meggers Deposition, 67–79.)

42. The Director of the Reapportionment Unit is Linda Meggers. During the reapportionment process, she worked under the direction of the Chairmen of the House and Senate Reapportionment Committees, and also reported to the Director of the Institute of Government. (Meggers Deposition, 67, 72–73.)

43. The staff of the Reapportionment Services Unit drew plans and provided census data to the legislators. (Meggers Deposition, 78–79.) The staff also prepared color-coded maps, including one of the Atlanta metropolitan area, showing the location of significant concentrations of black population. These maps were displayed on the walls of the reapportionment staff office and most legislators who came to the Reapportionment Unit for discussions with staff members passed through that office. (Bunting Deposition, 45–48; Nally Deposition, 24–27; Vey Deposition, 10.) With respect to the location of black population concentrations in the Atlanta metropolitan area, it was common knowledge amongst legislators and staff members that the black population had spread from Atlanta into south DeKalb County. (Nally Deposition, 27; Vey Deposition, 30–31; Allgood Deposition, 16–18; Bond Trial Testimony, 561; Elliott Deposition, 45–47.) The Atlan-

ta press, immediately prior to reapportionment, reported about the shift of black population to the southern suburbs of Fulton and DeKalb counties. (Defendants' Exhibit BBB, Atlanta Constitution, April 26, 1981.)

44. The reapportionment staff was given specific instructions by Linda Meggers regarding the manner in which districts should be drawn which contain black population concentrations. The staff was instructed by Meggers that they should try to avoid dilution or a reduction in black voting strength and that they were to inform legislators when reapportionment plans drawn at the legislators' request resulted in vote dilution. (Bunting Deposition, 22–23; Nally Deposition, 12–14; see also Vey Deposition, 17.) Furthermore, Meggers instructed the staff that a "safe black district" is a district that contains a 65 percent black population, and legislators understood that the 65 percent figure was the goal the staff was seeking to achieve. (Bunting Deposition, 18–21; Nally Deposition, 10, 14; Vey Deposition, 15, 50–51, 68–69; Lowe Deposition, 22–23, 160.) It was the understanding of the staff that a district must be 65 percent black in order for it to be considered "safe" because blacks have a lower voting age population and a lower registration rate than the white population. (Bunting Deposition, 18–21.) Finally, the staff was instructed that, in drawing district lines, they should try to avoid splitting black population concentrations and that they were to inform legislators when plans requested by the legislators resulted in the division of black populations. (Bunting Deposition, 14–17; Nally Deposition, 15–18.) Staff members also were provided with a copy of the memorandum prepared by the Office of Legislative Counsel which discussed how the Voting Rights Act applied to Georgia's reapportionment process. (Vey Deposition, 7–8.)

45. The Chairman of the House Reapportionment Committee, the Senate Reapportionment Committee, as well as the Speaker of the House, relied on the reapportionment staff to inform them when plans impaired minority voting strength and violated the Voting Rights Act. (Mur-

phy Trial Testimony, 59–60; Wilson Deposition, 216–217; Starr Deposition, 16–18.)

46. Other guidelines followed by the reapportionment staff in drawing plans were that they were to follow the one-person one-vote standard, district lines were to follow natural boundaries, county lines were not to be split if possible, and incumbents were to be kept in separate districts. There were no set instructions regarding the maintenance of existing district lines. (Bunting Deposition, 26–28; Nally Deposition, 9–11; Vey Deposition, 8–9.)

47. During the summer of 1981, prior to the General Assembly's Special Session on reapportionment, the reapportionment staff, at the direction and under the supervision of Linda Meggers, drew 16 alternative congressional reapportionment plans. These plans were designed to show the many different ways in which the existing congressional districts could be altered within the context of the one-person, one-vote standard. (Meggers Deposition, 494–496; 543–610; Defendants' Exhibit EE.) For example, Alternative 3 was developed with the "idea of creating a horseshoe suburban district around the top of Fulton County and a strictly mountain district across the top of Georgia." (Meggers Deposition, 551–552.) Alternative 4 was developed as an attempt to draw congressional districts that maintained proposed House and Senate districts within a single congressional district. (Meggers Deposition, 561–562.) With reference to the so-called "mountain district," some alternative plans drew such a district (e.g., Alternatives 3 and 6; see Defendants' Exhibit EE) while others did not (e.g., Alternatives 1, 2, 4, and 5; see Defendants' Exhibit EE.)

48. Though Meggers described the alternate plans as "practice exercises" for the reapportionment staff, the plans were presented to both the House and the Senate Reapportionment Committees and were sent to Georgia's Congressmen. (Meggers Deposition, 495–496.) Moreover, Alternate 7 Revised was adopted by the House Reapportionment Committee on August 12, 1981

(the Committee later adopted a different plan), and the Senate Reapportionment Committee, on August 18, 1981, adopted Alternate 11 Revised as amended by Senator Bond. (Bond Trial Testimony, 565–566; Joint Exhibits 12 and 13.)

49. The only district of the ten congressional districts in Georgia that basically remained the same in all the alternate plans was the Fifth Congressional District. In almost all the plans, the configuration of the Fifth District followed the pre-existing district line; it stretched from north to south Fulton County, with part of east Fulton County lying in the Fourth Congressional District and part of south Fulton County lying in the Sixth Congressional District. In three alternate plans (Alternates 4, 5 and 7 Revised), Fulton was divided between two congressional districts, districts Five and Six. (Defendants' Exhibit EE.) The black population percentage in the Fifth District in all the alternate plans remained between 51 and 52 percent. (Meggers Deposition, 509, 511, 660–662; Joint Exhibit 7, Transcript of Senate Reapportionment Committee Meeting of August 5, 1981, at 9.)

50. Though the alternate plans all contained basically the same configuration for the Fifth District, Linda Meggers had developed, in May, 1981, a potential Fifth District configuration known as "Fifth District Maximizing" which had a black population percentage of approximately 74 percent. The district lay on an east-west axis stretching across south Fulton and south DeKalb counties. This district could have been included in the alternate plans, but was not. (Defendants' Exhibit DD; Meggers Deposition, 380–382, 654–656.) Ms. Meggers testified, however, that had she not been bound by the pre-existing configuration of the Fifth District and had started from scratch, she would have drawn a district that went east to west to encompass the black concentration. (Meggers Deposition, 737–740.) "I would have drawn a black district. I would not have gone another direction that did not create a black district." (*Id.*, at 739.)

51. The Congressional reapportionment subcommittee adopted the plan submitted by Representative Benson Ham, which permitted the Fifth District a black population of 51.73%.

52. Representative Albert Scott, one of the two black members of the Reapportionment Committee, attempted to have plans for the Fifth District introduced in subcommittee. Scott's plans placed the Fifth District on an east-west axis, encompassing the black community of Metropolitan Atlanta. (Defendant's Exhibits TTT–VVV.)

53. Chairman Wilson persuaded Scott not to present his plans to the subcommittee and asked him to make his presentation to the full committee as an alternative to the subcommittee recommendation. (Scott Trial Testimony, 631.) According to Representative Scott, not one of his three options was acceptable to the full Committee. Chairman Wilson informed Representative Scott that "we might get to one of your options during the conference committee." (Scott Trial Testimony, 631–632.)

54. On August 12, 1981, the full House Reapportionment Committee adopted the plan presented by Representative Ham.

55. The Senate Reapportionment Committee was not divided into subcommittees.

56. The full committee narrowed its choice of congressional plans to two proposals which would have created a Fifth District in which the black population was 51.73% of the total population. (Defendants' Exhibits FF and GG; Joint Exhibit 7.)

57. On August 17, 1981, committee member Senator Julian Bond introduced a plan for the Fifth District which provided for a 73.38% black population.

58. Senator Bond's proposal encompassed the black communities of Fulton and DeKalb counties, abandoning the pre-existing north-south boundaries of the Fifth District. Senator Bond's rationale for drawing his plan, which he explained to the Senate Committee, was:

> to put together a large, harmonious, homogeneous black community living in southern Fulton and DeKalb counties

who share a common income level generally. The value of their housing stock is generally the same. Their education level is generally the same. And most important, their race is almost absolutely the same.

(Bond Trial Testimony, 561.)

59. The Bond plan did not affect districts other than the Fourth and Fifth. It was introduced relatively late in the committee process to insure that disputes on other districts had been resolved and that this proposal would have no effect on the drawing of the other districts. (Bond Trial Testimony, 564.)

60. The Bond plan was immediately criticized by Committee Chairman Hudson. The Chairman adjourned the meeting at which the Bond plan was introduced without holding a vote on the plan, commenting, "We've been informed and shocked, so we will look at that overnight." (Joint Exhibit 7, 30.)

61. The next day, the reapportionment committee adopted a plan which included the Bond proposal. Chairman Hudson cast the lone vote in opposition, in violation of Georgia Senate rules, which permit the Chairman to vote only in the event of a tie. (Joint Exhibits 4, 7.) That action was the first of several that Hudson would take to avoid a reapportionment plan which would allow blacks in the metropolitan Atlanta area a unified district.

62. When the Bond Amendment was brought to a vote, Senator Terrell Starr "took a walk," rather than vote on the Amendment. (Bond Trial Testimony, 565.) Senator Starr admitted that he opposed the Bond Amendment as proposed in Committee. (Starr Deposition, 65–68.) The record, as a whole, clearly demonstrates that Senator Starr and Senator Hudson were opposed to the Bond plan because the proposed Fifth District might allow the black community an opportunity to elect a candidate of its choice to the United States Congress. All other members of the Senate Reapportionment Committee supported the Bond plan.

63. The special session of the Georgia General Assembly convened on August 24, 1981. (Stipulation of Facts, ¶ 19.)

64. On August 25, 1981, Senator Hudson, as Chairman of the Senate Reapportionment Committee, introduced in the Senate the proposed congressional redistricting plan that had been adopted by the Senate Committee on August 18, 1981. The plan was introduced as Senate Bill 2 EX., which was read for the first time and in accordance with Senate procedures, transmitted back to the Senate Reapportionment Committee. In committee, the plan embodied in Senate Bill 2 EX. was substituted by the "Reynolds Revised plan with the Bond Amendment." (Defendants' Exhibit GG.) The Senate Committee recommended to the full senate that the Reynolds Revised Plan, as amended, be adopted. (Joint Exhibit 13.) This plan, like the earlier plan which had originally passed out of the Senate Committee, created a Fifth Congressional District with a 73.38% black population. (Bond Trial Testimony, 566.)

65. On the floor of the Senate, Chairman Hudson, along with Senator Starr—at the urging of Lt. Gov. Miller—introduced an amendment to the plan recommended by the Committee. (Hudson Deposition, 181–184; Starr Deposition, 27; Miller Deposition, 67–68.) The amendment did two things: it dealt with controversial Gwinnett County by splitting that county between two districts so that Gwinnett County would not overshadow the mountain district in the Ninth District; as noted in Finding ¶ 17, *supra,* the mountain district was the home of Lt. Gov. Miller and its electoral strength was of special concern to him. (Miller Trial Testimony, 169A; Finding ¶ 31, *supra.*) The amendment also drew a Fifth District with a 55.74% black population and placed the City of Atlanta in the Fifth District. Much of south Fulton County was placed in the Sixth District, with the exception of Senator Hudson's residence and senatorial district. (Defendants' Exhibit HH.)

66. Senator Bond moved to amend the Hudson-Starr plan to allow a Fifth District with a 69.01% black population; the Bond

amendment was essentially the same as the plan adopted by the Senate Reapportionment Committee. (Defendants' Exhibit RRR.)

67. Senator Hudson went to the well of the Senate and spoke in opposition to the Bond amendment: "It brings out resegregation in a fine county like Fulton and resegregation in a fine city like Atlanta." (Defendants' Exhibit W.) He also argued that the Bond plan would disrupt the "harmonious working relationship between the races" in Atlanta and Fulton counties, (Bond Trial Testimony, 568; Allgood Deposition, 20–21) and would cause "white flight" from the county. (Nalls Deposition, 153.) The thrust of Senator Hudson's argument, according to Senator Allgood, was that "you are dividing the Congressional Districts into black and white and they [the races] should be commingled...." (Allgood Deposition, 20–21.) At trial, Senator Hudson admitted that his opposition to Senator Bond's plan was stated in racial terms. (Hudson Trial Testimony, 363.)

68. Two additional Senators went to the well to support the Bond amendment. Senator Tate, the only other black Senator in the General Assembly, responded to Senator Hudson's remarks. He noted that it was peculiar that people worried about the harmonious working relationships in the single district in which whites might constitute the minority of the population, but made no mention of working relationships in the other nine congressional districts in which whites constituted 65 percent or more of the population and blacks were in the minority. (Bond Trial Testimony, 568.) The second spokesperson, Senator Allgood, emphasized his support of the Bond plan and attempted to dispel the racist characterizations of the proposed Fifth District. He noted:

> If it is a ghetto, so be it. We did not create it. We merely recognize in this amendment what exists there, and we give those people an opportunity, a mere opportunity. If they want to elect [a] black, let it be.

(Defendants' Exhibit W, Video Transcript at 3.)

69. Both Senators Hudson and Starr voted against the Bond amendment, which the Senate adopted. (Joint Exhibit 13, at 139.)

70. The final plan passed by the Senate contained the Bond amendment. It was transmitted to the House for consideration.

71. The House referred the Senate plan to the reapportionment committee, which rejected it. (Joint Exhibit 6.) It chose instead a plan designed by Representative Williams and Chairman Wilson (who at trial disavowed any part in its formulation). (Wilson Trial Testimony, 414.) That plan returned to the pre-existing Fifth District configuration, which split Fulton County, and the black population, into three congressional districts. The total black population in this Fifth District proposal was 51.74%. (Defendants' Exhibit MM.)

72. Joe Mack Wilson opposed the Bond plan. Representative Wilson testified at trial that his objection to the Bond plan was that it packed or herded "all the black people in one district, and created a lily white district on the opposite side in the Fourth District." (Wilson Trial Testimony, 417, 457–458.) He admitted, however, that he does not consider the creation of a congressional district with a 70 percent white population to be herding whites as "they were already there." (*Id.*, 460–461.) The inconsistency of Chairman Wilson's standards is based solely on race.

73. At trial, Chairman Wilson and Speaker Murphy also raised the spectre that a Republican would be elected from the Fourth District under the Senate plan. (Wilson Trial Testimony, 489; Murphy Trial Testimony, 67–68.) This testimony, however, is entirely inconsistent with their previous testimony on the subject. Chairman Wilson testified in deposition that the possible creation of a Republican district played no role in his opposition to the Senate plan. (Wilson Deposition, 677.) He also observed that throughout the House, there "ain't no fear of Republicans," and cited the fair reapportionment of Republican Newt Gingrich's Sixth District as evidence. (*Id.*, 678.)

Similarly, Speaker Murphy denied opposition to Republican districts. He testified that "we made no efforts . . . to try to get it to where a Republican who is now serving couldn't be re-elected." (Murphy Deposition, 131.)

74. On the House floor, there were three attempts to amend the Williams-Wilson plan with respect to the Fifth District and one attempt to substitute it. Rep. William McKinney, a black representative, proposed a Fifth District with a 60.87% black population. This plan was identical to that proposed by Rep. Scott during the presession committee process. The second amendment, introduced by Reps. Bolster and Fuller, was similar to the McKinney proposal. The final proposed amendment was offered by Rep. Lane. It removed approximately 2,900 "moderate, conservative folks" from the Fifth District and placed them in the Sixth District in order to "give [them] representation." (Joint Exhibit at 84.) Rep. Scott offered a substitute to the Williams-Wilson plan, which created a Fifth District with a 60.87% black population. Two primary spokesmen for the House leadership, Reps. Williams and Ham, voiced strenuous opposition to the three amendments and Scott Substitute 13A. Representative Williams stated from the well of the House that he "[did not] see that we need to unnecessarily create a minority district in Fulton and DeKalb." (Joint Exhibit 16, at 73.) Representative Ham criticized the Bolster-Fuller Amendment and Scott's Substitute 13A because they created "a primarily white district in northeastern Fulton County and DeKalb County and Rockdale County and a primarily black district in the Fifth District in Fulton County." (Joint Exhibit 16, at 74.) According to Representative Ham, the two incumbent Congressmen from the Fourth and Fifth Districts would lose their seats as a result of such a reapportionment. (*Id.*) Moreover, Representative Ham considered the creation of 60.87 percent black district in Fulton and DeKalb Counties to be the product of racial gerrymandering. (*Id.,* 17.) He was not able, however, to respond to challenges by members of the Legislative Black Caucus about the inequity of the Williams-Wilson plan which, first, created nine congressional districts having 60 percent or greater white population and, second, gerrymandered part of the black community in southeast Fulton County out of the Fifth District and placed it in the Fourth. (*Id.,* 16–17; *see* also Defendants' Exhibit SSS.)

75. All three amendments were defeated; the Scott substitute was never presented to the House for a vote. (Joint Exhibit 12.)

76. The Williams-Wilson substitute for the Senate Bill was passed. (*Id.*) Under the House plan, Fulton County and its black population were split into three congressional districts—the Fourth, the Fifth and the Sixth. (Defendants' Exhibit OOO.) The Fifth District had a black population of 51.74%.

77. Mr. Wilson has virtually admitted that his proposal for the Fifth Congressional District was motivated by a desire to minimize black voting strength. He testified at trial:

> [T]he Senate has passed one that is about [69] percent. So although I don't have any objections to the Scott Plan [with a 60.87 percent black Fifth District] as a personal thing, I don't want to start out at 60 percent to negotiate.

(Wilson Trial Testimony, 470.) Mr. Wilson was of the view that the Voting Rights Act would clearly not allow him to lower the black percentage of the Fifth District below 50%, (Wilson Trial Testimony, 404) and, thus, in light of what the Senate had done, he determined that a 51 percent black district was "the place you start." (Wilson Trial Testimony, 461.) Although Mr. Wilson recognized that the foreseen conference procedure would require some movement from 51 percent, he clearly was determined to maintain black voting strength at the lowest possible level. This strategy was consistent with his opposition to drawing what he referred to as a "nigger district."

78. The Senate rejected the House substitute for the bill; the House reaffirmed its position. (Stipulation of Facts, ¶¶ 27,

29.) Thereupon, conference committees for the House and Senate were appointed.

79. The Conference Committee was principally responsible for the reapportionment of the Fourth and Fifth Districts which ultimately were included in Act No. 5.

80. The power of the conference committee cannot be underestimated. As Chairman Wilson explained to Representative Scott during the reapportionment committee process: "[T]he congressional reapportionment was not going to be decided at the committee level nor on the full floor of the House. It would be decided in conference committee." (Scott Trial Testimony, 612.)

81. The conference committee controls the final form of legislation (Elliott Deposition, 38–39.) A conference committee report cannot be amended on the floor of the House or the Senate, so the members must either accept or reject the report. Theoretically, a legislator may make a motion to instruct the conference committee to consider a different viewpoint, but such efforts would be futile if the leadership opposed the suggestion. Thus, there is no legislative mechanism for presenting views which are contrary to the leadership's position before the General Assembly for a vote. (*Id.*)

82. The identity of the conferees makes a significant difference in the final legislation adopted.

83. The reapportionment conference committee was packed by the House and Senate leadership with individuals who overtly opposed any plan which would unite the black population in the metropolitan Atlanta area or increase the black population above a level that satisfied the "no retrogression" effect test of Section 5. The Conference Committee demonstrated best of all the discriminatory purpose of the Georgia legislature in adopting Act No. 5.

84. The only criterion for appointment to the Conference Committee from either the House or the Senate is that a legislator must have supported his chamber's proposal as a whole, even if he opposed certain aspects of the proposal. (Joint Exhibit 3.)

85. In the House, Speaker Murphy's asserted criteria for selecting the three House Conferees was that each section of the state (north, middle, south) be represented. (Murphy Trial Testimony, 32.)

86. No blacks were selected to serve on the conference committee although some satisfied the criteria for selection. Speaker Murphy claimed to have asked Representative Hamilton to serve on the committee; (Murphy Trial Testimony, 44); Rep. Hamilton denied ever being asked to serve. (Hamilton Trial Testimony, 141.)

87. Speaker Murphy refused to put Rep. Scott on the conference committee because, "I did not think that [the conferees] would ever reach a conclusion of a conference committee report that the House would ever adopt." (Murphy Trial Testimony, 45.) Since the Senate plan had already been defeated in the House, nothing would be accomplished by placing "a Representative on there who would come back with that same plan." (*Id.*, 45–46.) Speaker Murphy was fully aware, however, that the Black Caucus also endorsed the Scott plan which provided for a much lower percentage of black population in the Fifth District than the Bond plan. (*Id.*, 47.) The 60.87 percent plan was also unacceptable to the Speaker because the House had previously voted on and defeated this plan in the form of the McKinney Amendment. (*Id.*, 49.) That single vote was sufficient to convince the Speaker that if he had put "Representative Scott on [the conference committee] it would [n]ever come back with a plan that the House would adopt." (*Id.*, 48.) The Speaker agreed, however, that Representative Scott could have signed a conference report with the three Senate conferees, and, thereby, passed out a conference report that would have given House members an opportunity to vote on the 60.87 percent plan. (*Id.*, 48.) Speaker Murphy consciously denied the House members the opportunity to vote on such a plan.

88. Speaker Murphy testified that he opposed the Bond Amendment because "I was concerned that . . . we were gerryman-

**510**

dering a district to create. a black district where a black would certainly be elected...." (Murphy Trial Testimony, 68.) Speaker Murphy's attitude about a majority black district is also reflected in a statement he previously made to several legislators. Speaker Murphy had delivered a speech to a Parents-Teachers Association meeting in DeKalb County. The audience had only two black individuals in attendance. After the speech, Speaker Murphy described the racial composition of the audience to several legislators, and noted, "Wouldn't you love to have a district like that." (Elliott Deposition, 132–133.)

89. Speaker Murphy's racial attitudes are highly relevant to this case because he appointed the House conferees—the ultimate decision-makers in the congressional reapportionment process. The evidence demonstrates that Speaker Murphy purposefully discriminated on the basis of race in selecting House members to serve on the conference committee. He selected white persons whom he knew would adamantly oppose the creation of a congressional district in which black voters would be able to elect a candidate of their choice to the United States Congress; and he refused to appoint black persons to the conference committee solely because they might support a plan which would allow black voters, in one district, an opportunity to elect a candidate of their choice.

90. Speaker Murphy appointed Representative Ham, who authored the initial House proposal for the Fifth District containing a bare minimum black population to satisfy the "effect" element of Section 5. Speaker Murphy also appointed freshman legislator John Godbee, who was described as a pliable, inactive participant in the reapportionment process. (Elliott Deposition, 40–41.)

91. Speaker Murphy also appointed Rep. Joe Mack Wilson. Throughout the conference process, Wilson's asserted goal was "if that line [in the House plan] splits it [the black population], I was going to continue to hold that line" which formed the previous boundary for the Fifth District and

which split the black population in greater Atlanta. Wilson said he opposed the Senate plan because it "packed all the black people in one district." (Wilson Trial Testimony, 417, 457–458.) Wilson had no objection to "packing" the white voters in the mountain district into one congressional district. (Id., 460–461.)

92. In the Senate, Lt. Gov. Miller's opposition to the Bond plan motivated his selection of the Conference Committee members. His proffered reason for opposing the Bond plan was that it split the mountain district and created a Republican Fourth District. The Bond plan had no effect on the mountain counties. (Joint Exhibit 13.) An examination of the Bond Amendment and S.B. 2 EX. proves that the Lieutenant Governor's opposition to the Bond Amendment could not be based on its impact on the mountain counties (Joint Exhibit 13, 137–138; Joint Exhibit 14); all ten mountain counties are included in the Ninth District and the Bond Amendment, by design, affected only the Fourth and Fifth Districts. (Miller Trial Testimony, 190–191; Bond Trial Testimony, 563–565, 566–567.)

93. The Lieutenant Governor's alleged reason for opposing the configuration of the Fourth District, i.e. it created a Republican district, is similarly suspect. According to Senator Bond, no Senator argued at the time of reapportionment that the Bond Amendment would result in the creation of a Republican congressional district. (Bond Trial Testimony, 568.) Senator Paul Coverdell, a Republican who is minority leader in the Senate, agreed that the issue of creating a Republican district was not raised in reference to the Bond Amendment during the entire process. He stated:

This was not a Republican matter. The entire issue that was being debated was what the minority percentage would be in the Fifth District, pure and simple. There were many instances one might note that would indicate ample opportunity to indicate that this was a Republican-Democrat matter. In fact, this was not. The question was minority representation in that district.

(Coverdell Trial Testimony, 599–600.) Moreover, it is significant that Lieutenant Governor Miller did not oppose the reapportionment of the Sixth Congressional District, which is represented by Republican Newt Gingrich. The Sixth District under both S.B. 2 EX. and Act No. 5 remained virtually the same as it had been under the 1972 reapportionment plan. (Plaintiffs' Exhibit 1.) Thus, the single incumbent Republican Congressman from Georgia was treated quite differently than one would expect if the fear of Republican representation were sincere. Furthermore, Lieutenant Governor Miller put his seal of approval on the plan drawn by Senator Hudson (the Hudson-Starr plan), which before it was amended by the Bond Amendment, put a portion of the predominantly Republican Gwinnett County (Wilson Trial Testimony, 418) in the Fourth Congressional District. (*See* Defendants' Exhibit HH.)

94. Beyond the technical requirement that a conferee must have voted in support of his chamber's proposal, it is expected that a conferee will urge adoption of a final bill which embodies as much of his chamber's proposal as possible. (Murphy Trial Testimony, 44; Miller Trial Testimony, 179.) Notwithstanding this custom and notwithstanding the fact that the Fifth District was a major conference issue, Lt. Gov. Miller appointed the two most outspoken opponents to the Bond amendment contained in the Senate bill: Senator Starr and Chairman Hudson. Mr. Miller purposefully discriminated on the basis of race in selecting Senate members to serve on the conference committee. He not only denied Senator Bond a position on the conference committee because of Senator Bond's race, but he also selected two members (out of three) who were adamantly opposed to the Senate's position on the area of primary dispute.

95. Senator Bond was not appointed to the conference committee because, "it would offend the House." (Bond Trial Testimony, 571.)

96. There were only two major issues considered in conference: the division of Gwinnett County (whose population was not welcomed in the homogeneous mountain district) and the racial composition of the Fifth District. (Hudson Trial Testimony, 367; Wilson Trial Testimony, 417–418.)

97. The Conference Committee produced six reports before the House and Senate finally agreed on a reapportionment plan. The initial six conferees were reappointed to each succeeding conference committee. (Stipulations of Fact, ¶¶ 30–47.)

98. Virtually no serious discussion of alternate plans occurred at the conference committee meetings. (Bond Trial Testimony, 573; Nalls Deposition, 162; Nally Deposition, 34–35.) The meetings seldom lasted more than two or three minutes, and the substance of the discussion was essentially "We've rejected that already;" "Go back and bring us something else;" or "We will take it back and study it or try it and see what our people say and bring it back later." (Bond Trial Testimony, 573.) One observer noted that as the meetings progressed, "you got the distinct impression that the decision was made before they walked in there." (Nalls Deposition, 162.) The Senate conferees participated equally in the meetings. As for the House conferees, "Representative Wilson . . . absolutely dominated the proceedings. Representatives Ham and Godbee seldom, if ever, speaking; then when they did, deferring to Representative Wilson." (Bond Trial Testimony, 574; Kidd Deposition, 18.)

99. Reapportionment of the Fifth District dominated the conference committee's discussions from September 3 to September 10, 1981, at which time the First Conference Committee Report was passed out of Committee. (*See* Joint Exhibit 17.) The debate on the Fifth District focused solely on the percentage of black population to be included in the district. (Bond Trial Testimony, 579; Kidd Deposition, 19; Nalls Deposition, 162–166; Vey Deposition, 40–49; Allgood Deposition, 49.) There was no discussion pertaining to the creation of a new Republican district (Bond Trial Testimony, 574; Vey Deposition, 48–49), the desired placement of particular black neighborhoods of

DeKalb County in the Fourth District (Bond Trial Testimony, 579), or the desired maintenance of the pre-existing configuration of the Fifth District. (Kidd Deposition, 40; Bond Trial Testimony, 574.)

100. The Senate conferees presented five or six proposals over a period of several meetings, that created a Fifth Congressional District in which the black population ranged from 62 to 64 percent of the total population. (Kidd Deposition, 18–19; Defendants' Exhibit PP.) Chairman Wilson summarily rejected the plans, without permitting the other House conferees to review them. (Kidd Deposition, 19, 30.) According to Senator Kidd, the "only input he [Representative Wilson] seemed to have any interest in was the percentage of minority as it would be in that particular Congressional area." (*Id.*, 19.) Plans that contained a Fifth District with more than 51 percent black population simply were "not acceptable and that was it." (*Id.*, 30.) According to one reapportionment staff member, "[Joe Mack Wilson's] job there was just to be stubborn and that's exactly what he was. And he stone-walled whatever progress could have been made. . . ." (Vey Deposition, 45.)

101. Chairman Wilson's notion of compromise is clearly revealed by his proposed congressional plans, two of which have been identified by the reapportionment staff as House Compromise Plan, September 7, 1981, and House Compromise # 2. (Defendants' Exhibit NN and OO.) Both plans contained a Fifth District with a 51.74 percent black population, identical to the House Substitute plan. Chairman Wilson testified that "[he] was hopeful [that he could compromise] at 51. . . I was hopeful that I wouldn't [have to compromise higher than that.]" (Wilson Deposition, 328–329.)

102. Chairman Wilson elaborated on his position on the Fifth District reapportionment outside the committee meetings. In a conversation with several white Democratic legislators during this time, Chairman Wilson was asked whether reapportionment was settled. He responded, "No. We are still working on that district, Fourth and Fifth District, Julian's district." Wilson would not predict the outcome but stated, " 'I'm not for drawing a nigger district and I'm not for drawing a Republican district.' " (Hudgins Deposition, 10–11.) Chairman Wilson also indicated that he was not in favor of drawing a district that gave blacks in Georgia the opportunity to elect a black Congressman. (Hudgins Deposition, 10–12.)

103. After a seven-day stalemate, the Conference Committee produced its first report which resulted in a Fifth District with a 51.74 percent black population; it was identical to the House plan. (Joint Exhibit 17.) Rep. Wilson refused to consider any other plan. The Senate rejected that report. (Stipulation of Facts, ¶ 31.)

104. The second configuration for the Fifth District drawn by the Conference Committee was the result of Wilson's only compromise on the Fifth District. The plan was virtually unaltered in the succeeding conference reports. The plan split Fulton County into three Congressional districts; north Fulton County was placed in the Fourth Congressional District with DeKalb County; the City of Atlanta, including that portion of Atlanta in DeKalb County, and parts of unincorporated south Fulton County constituted the Fifth District; the so-called "Tri-City" area of Hapeville, East Point and Union City (included in Senator Hudson's senatorial district) in South Fulton County was placed in the Sixth Congressional District. The plan also split several municipalities in north and south Fulton County. The concentration of black population in South Fulton and DeKalb counties was split into three congressional districts. (Joint Exhibit 17.) The plan allowed a 57.28 percent black population in the Fifth District.

105. According to several legislators, presentation of the plan calling for a 57 percent black Fifth District was the House leadership's prearranged strategy. According to Senator Kidd, Chairman Joe Mack Wilson jumped rather suddenly to a 57 percent black population in the Fifth District and "indicated very strongly that that's as high as they [the House Conferees] could

go." (Kidd Deposition, 40–41.) Representative Elliott testified that "after the Bond plan came over from the Senate with 60-some-odd percent black composition, that the House leadership arrived at this magical 57 percent figure and, by God, they were not going to budge." (Elliott Deposition, 48.) He noted that no logical or legal reason was given for the 57 percent plan.

> The important thing to me it had little or nothing to do with either county lines or community of interests concepts. It was just flat percentage that, by God, this is the highest we are going to go, come hell or high water—no matter what the logical reasons might be for adjusting the black-white ratios in any given percentage. . . .

(Elliott Deposition, 49.) Senator Bond testified that Conference Committee Reports 2–6 provided for a Fifth District with a 57 percent black population because "the House Conferees knew that the 57 percent black population district was in fact a 46 percent black voting district and that ·a black candidate for office would be unsuccessful in that district." (Bond Trial Testimony, 577.)

106. The Second Conference Committee Report failed to pass either House. (Stipulation of Facts, ¶¶ 34–35.)

107. The only manner in which the Fifth District configuration changed in subsequent reports was, in the third report, to reunite the City of Alpharetta, at the request of a white Representative, Luther Colbert, and in the fourth report, to place four predominantly white census tracts in that portion of Atlanta which is located in DeKalb County. (Wilson Trial Testimony, 465; Joint Exhibits 18 and 19.)

108. In contrast to the committee acceding to the request of white legislators, requests of black legislators to increase the percentage of black population in the Fifth District were ignored. (Randall Deposition, 28–29.)

109. Representative Scott approached Representatives Ham and Wilson and inquired about the possibility of the conferees adopting his 60.87 percent option. Representative Ham replied that his hands were tied, "that he had to support the chairman's position, Chairman Wilson." (Scott Trial Testimony, 642.) Representative Scott had approached Representative Ham because Senator Kidd had told him that "if the [Black Caucus] would get Ham or one of the other conferees on the House, that he would work on the Senators. It would only take four of the conferees to pass a plan." (Scott Trial Testimony, 642.) Representative Wilson, however, dashed all hopes that the Conferees or the Georgia House would have an opportunity to consider Representative Scott's 60.87 percent plan. According to Representative Scott, Representative Wilson told him that "if you blacks want anything . . . higher than this 57 percent, you better be prepared to get it from the Justice Department or the courts." (*Id.,* 641.)

110. Chairman Wilson's opposition to Representative Scott's 60.87 percent option plan was based solely on the percentage of blacks in the Fifth District. In comparing the Scott option to conference Committee Reports 2–6, Representative Wilson acknowledged that: 1) the Scott plan, like the committee plans, placed part of north Fulton County in the Fourth District; 2) the Scott plan included more of south Fulton County in the Fifth District than the committee plans, consistent with the House's reapportionment criteria; and 3) the Scott plan included all of Atlanta/DeKalb in the Fifth District, rather than divide the city as in the committee plans, which was again consistent with the reapportionment criteria. (Wilson Trial Testimony, 472–473.) Chairman Wilson agreed that the single difference was that Representative Scott's plan had a Fifth Congressional District with over a 60 percent black population. (*Id.,* 472.)

111. Representative Thomas Phillips, a white representative from Gwinnett County, received the same treatment as members of the Black Caucus when he prepared a plan during the Conference period that left Gwinnett County intact in the Ninth Congressional District and created a Fifth

Congressional District with a 60 percent black population. Phillips had taken copies of his plan to the clerk's office for distribution, but later learned that Speaker Murphy had given instructions to not distribute the congressional plan. After Phillips discovered the order, the Speaker permitted the plan to be distributed. (Phillips Deposition, 26–27.)

112. Representative Phillips introduced the plan in the House on September 15, 1981, after the Fourth Conference Report had been defeated. (Joint Exhibit 16 at 128.) He requested an instruction that the House Conferees take the plan to the Senate Conferees for their consideration. (*Id.,* 30.) When Chairman Wilson learned of Phillips' proposal, he "came storming down the center aisle" and told Phillips, "You keep this up, and we're going to get you goddamned Republicans and get them damned niggers too." (*Id.,* 28; Wall Deposition, 27–28.)

113. Subsequent committee work focused on how to apportion troublesome Gwinnett County and shifted lines to accommodate legislators' interests in the districts of state transportation officers— whose districts are controlled by congressional districts.

114. Conference Report No. 5 made no change in the Fourth and Fifth Districts. The Senate rejected that report.

115. After several Conference Committee reports were defeated, the House and Senate leadership exerted tremendous pressure on legislators to pass a plan. From the well of the House, representatives described the "pressure and arm-twisting on members of this House by the House Leadership and especially by our Speaker." (Joint Exhibit 16 at 97.) One legislator noted, however, that "Speaker Murphy is a pussycat when compared with Zig Zag Zell [Miller] and his arm-twisters from across the hall." (*Id.*) During the debate on the Fifth Conference Report, which was passed by the House, (Joint Exhibit 12 at 496), Representative Scott stated from the well of the House that:

I saw one fellow approach my desk over there shaking his arm; I don't know

what was wrong with it, I expect he got it twisted. This plan is very much like [the one] we looked at last night with the exception that perhaps enough arms have been twisted that maybe the vote's a lot closer.

(Joint Exhibit 16 at 144.) The same theme was described during the debate of the Sixth Conference Report; Legislators were afraid of being "hurt" if they didn't vote for the leadership plan. (*Id.,* 194).

116. Conference Report No. 6 became Act No. 5 when adopted by the Georgia House and Senate.

117. According to Senate Majority Leader Allgood, several Senators specifically told him that they were going to vote for the Sixth Report because "my district is all right and if we keep on with new plans then sooner or later the dime is going to fall on my district like it has on yours." (Allgood Deposition, 43–44.) A second reason that Senators cited as the basis for their affirmative vote on Conference Report Six was they "[didn't] want to have to go home and explain why I [the Senator] was the leader in getting a black elected to the United States Congress." (*Id.,* 43.)

118. The same sentiment was expressed by members of the House. According to Representative Wall, the Bond plan was perceived "as an effort to put Julian Bond in the United States Congress and most of those members of the House were not going to have any part of doing that or be a party to doing that." (Wall Deposition, Vol. II, 77–73.) Representative Godbee, a member of the Conference Committee, advised Representative Felton that,

We [the conferees] didn't really feel that it [Act No. 5] would be approved by the Justice Department but we felt that it would be better politically if we were forced to draw a black district then for us to voluntarily go back and let it be known that we were on a Conference Committee or that even our other colleagues in the House voted for a district to seat a black.

(Felton Deposition, 35.)

119. The only reason the Georgia General Assembly failed to enlarge the black

population in the Fifth District more than it did and failed to unite black neighborhoods was solely because the population was of the black race.

120. There was no legitimate, nondiscriminatory reason why the Fifth District was drawn the way it was.

121. Numerous legislators perceive that the Fifth Congressional District under Act No. 5 was adopted for a racially discriminatory purpose. (Bond Trial Testimony, 580; Felton Deposition, 377, 155; Allgood Deposition, 30, 68; Randall Deposition, 55–56; Lowe Deposition, 50–53; Wall Deposition, 33–35, Vol. II, 72.) One legislator stated that "the motivation of the House leadership" in creating the Fifth District under Act No. 5 was to "increase [the percentage of black population] just enough to say they had increased it [and] so that it would look like they had increased it, but they knew they had not increased it enough to elect a black." (Felton Deposition, 155.) According to Representative Lowe, "It was just a fact that the majority of the members on the floor did not want to draw a black Fifth District." Legislators wanted to keep the Fifth District "as white as possible ... but just within the limits ... to satisfy the Voting Rights Act. . . . " (Lowe Deposition, 50.)

122. The purported goals of maintaining "historical borders," preserving county and city lines and avoiding a Republican Fourth District were only pretexts for discrimination. Those goals were ignored when drawing the First, Third, Sixth, Seventh, Eighth, Ninth and Tenth Districts. (See Finding ¶ 33, supra.) The goal of uniting a cohesive voting bloc was followed in the white mountain district; it was abandoned in the black south Fulton and DeKalb area.

123. The discrimination in this case is explicit and implicit. The contradictions, illogical justifications and feigned ignorance reflected in testimony at trial indicate an attempt to cover-up the true motive of the Georgia General Assembly.

124. The words of Wilson and Hudson speak for themselves insofar as these legislative leaders expressed a strong determination to limit the percentage of the black population in the new Fifth District. Their demeanor while testifying also indicated a lack of candor on their parts. To the extent that their testimony conflicted with other testimony or evidence with respect to the purposes underlying the enactment of Act No. 5, it must be discredited as untrustworthy.

125. The actions of the legislators who adopted Act No. 5 also speak for themselves. The legislators knew a cohesive black community existed in south Fulton and DeKalb Counties, that it would take a 65 percent black population to allow a black electoral majority and that the Fifth District embodied in the final conference report divided the black community and prevented a black majority. The Fifth District was drawn to suppress black voting strength in Georgia.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction to hear this case. 42 U.S.C. § 1973c; 28 U.S.C. § 1346(a)(2); 28 U.S.C. § 2201.

2. This Court is properly convened as a court of three judges. 42 U.S.C. § 1973c; 28 U.S.C. § 2284.

3. The State of Georgia is subject to the preclearance requirement of Section 5. *Georgia v. United States,* 411 U.S. 526, 527–528, 93 S.Ct. 1702, 1704, 36 L.Ed.2d 472 (1973).

4. If the United States Attorney General refuses to preclear a voting plan submitted to him pursuant to Section 5, the State must obtain a declaratory judgment from this Court before it may implement the plan. 42 U.S.C. § 1973c.

5. In an action for a declaratory judgment under Section 5, the burden of proof is on the plaintiff. *South Carolina v. Katzenbach,* 383 U.S. 301, 335, 86 S.Ct. 803, 822, 15 L.Ed.2d 769 (1966); *Georgia v. United States,* 411 U.S. at 538, 93 S.Ct. at 1709. To sustain that burden, the State of Georgia must demonstrate the absence of both discriminatory purpose and discriminatory effect.

6. The focus of this litigation is on Congressional Districts Five and Four in the Atlanta area. If Plaintiffs can demonstrate that the manner in which Districts Five and Four were drawn is free of racially discriminatory purpose and effect, then they are entitled to the relief they seek. No party has contended that the manner in which the remaining eight districts were drawn justifies the denial of the requested declaratory relief.

7. The Fifth District contained in Act No. 5 has a higher black population percentage than under the existing plan, there is no retrogression. Thus, technically, the voting plan does not have a discriminatory effect, as that term has been construed under the Voting Rights Act. *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1975).

8. Simply demonstrating that a plan increases black voting strength does not entitle the State to the declaratory relief it seeks; the State must also demonstrate the absence of a discriminatory purpose. *City of Richmond v. United States,* 422 U.S. 358, 378–379, 95 S.Ct. 2296, 2307–2308, 45 L.Ed.2d 245 (1975); *City of Rome v. United States,* 446 U.S. 156, 172, 100 S.Ct. 1548, 1559, 64 L.Ed.2d 119 (1980).

9. The Supreme Court has emphasized the importance of discriminatory purpose in a Section 5 case:

[I]t may be asked how it could be forbidden by § 5 to have the purpose and intent of achieving only what is a perfectly legal result under that section and why we need remand for further proceedings with respect to purpose alone. The answer is plain, and we need not labor it. An official action ... taken for the purpose of discriminating against Negroes on account of their race has no legitimacy at all under our Constitution or under the statute. Section 5 forbids voting changes taken with the purpose of denying the vote on account of race or color. Congress surely has the power to prevent such gross racial slurs.... "[a]cts generally lawful may become unlawful when done to accomplish an unlawful end...."

[A voting change] proved to be of this kind and not proved to have a justifiable basis is forbidden by § 5, whatever its actual effect may have been or may be. 422 U.S. at 378–379, 95 S.Ct. at 2307–2308.

10. The Supreme Court in *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1975), the case in which the nonretrogression test for effect was announced, recognized that nonretrogression is not the only test for compliance with the Voting Rights Act. The Court emphasized that even an ameliorative plan would violate Section 5 if it "so discriminates on the basis of race or color as to be unconstitutional." 425 U.S. at 141 n. 14, 96 S.Ct. at 1364 n. 14.

11. A plan is unconstitutional if it is adopted with an invidious discriminatory purpose constituting a denial of equal protection. *State of Mississippi v. United States,* 490 F.Supp. 569, 583 (D.D.C.1979).

12. If racial purpose "has been a motivating factor in the decision," the State has unconstitutionally denied black citizens equal protection. *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977).

13. Direct and circumstantial evidence are both relevant to a finding of discriminatory purpose. "[I]nvidious discriminatory purpose may often be inferred from the totality of relevant facts." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976).

14. Proof of discriminatory intent requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights, supra,* 429 U.S. at 266, 97 S.Ct. at 564.

15. Overt racial statements, present in this case, provide only one basis for finding discriminatory intent. Justice Stevens noted in *Washington v. Davis, supra:* "Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evi-

dence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds." 426 U.S. at 253, 96 S.Ct. at 2054 (concurring opinion). In this case, the state fragmented the large and contiguous black population that exists in the metropolitan area of Atlanta by splitting that population between two Congressional districts, thus minimizing the possibility of electing a black to Congress in the . Fifth Congressional District. The impact of this state action is probative of racial purpose.

■ 16. "Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by the courts or made illegal by civil rights legislation, and that they were replaced by practices which, though neutral on their face serve to maintain the status quo." *Rogers v. Lodge,* ── U.S. ──, ──, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982).

■ 17. The absence of a legitimate, non-racial reason for a voting change is probative of discriminatory purpose, "particularly if the factors usually considered by the decision makers strongly favor a decision contrary to the one reached." *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564. The evidence in this case demonstrates no legitimate nonracial reason for adoption of a Fifth District which split a cohesive black community. Moreover, the purported criteria for apportionment were ignored.

■ 18. The evidence demonstrates that the State attempted to "maximize" the voting strength of persons in other areas whom State officials believe to possess similar communities of interest. For example, the Lieutenant Governor expressly required that the "mountain people" be maintained in one district for the precise reasons that Senator Bond proposed that the black neighborhoods of Fulton-DeKalb be maintained in one district. Thus, although the

Voting Rights Act does not require the State to maximize minority voting strength, if the State determines to implement a policy of preserving "communities of interest" it bears a heavy burden under the Act to demonstrate why such a policy would be implemented in white residential areas but not in black residential areas. "Such unexplained departures from the results that might have been expected to flow from the [State's] own neutral guidelines can lead ... to a charge that the departures are explicable only in terms of a purpose to minimize the voting strength of a minority group." *Connor v. Finch,* 431 U.S. 407, 425, 97 S.Ct. 1828, 1839, 52 L.Ed.2d 465 (1977). The evidence here of the divergent utilization of the "community of interest" standard is indicative of racially discriminatory intent.

■ 19. Overt racial statements, the conscious minimizing of black voting strength, historical discrimination and the absence of a legitimate non-racial reason for adoption of the plan at issue mandates the conclusion that Act No. 5 as it pertains to the Fourth and Fifth Congressional districts has a discriminatory purpose in violation of Section 5.

■ 20. A plan which is the product of purposeful racial discrimination, "has no legitimacy at all under our Constitution or under [Section 5]." *City of Richmond v. United States, supra,* 422 U.S. at 378–379, 95 S.Ct. at 2307–2308. *See also Beer v. United States, supra,* 425 U.S. at 141 n. 14, 96 S.Ct. at 1364 n. 14; *Donnell v. United States, supra; Hale County v. United States, supra; Mississippi v. United States,* 490 F.Supp. 569, 581, (D.D.C.1979), *aff'd,* 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980) ("Plaintiff's burden in a suit for declaratory relief under Section 5 is to demonstrate that the reapportionment plan ... fairly reflects the strength of black voting power as it exists.")

■ 21. In concluding that Plaintiffs have failed to demonstrate that the manner in which the Fifth and Fourth Districts of Act No. 5 were drawn is not the product of

purposeful racial discrimination, the Court expresses no view as to which plan the General Assembly should have adopted. The plan drawing process is a legislative responsibility (*Reynolds v. Sims*, 377 U.S. 533, 587, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964); *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975)), but the Voting Rights Act requires that it be carried out without racial discrimination. The record clearly reveals that if the "gross racial slurs" (*City of Richmond v. United States, supra*, 422 U.S. at 378, 95 S.Ct. at 2307) had been eliminated from the reapportionment process, the boundary between Districts Five and Four would have been drawn differently; it is not possible for the Court to conclude which plan might have resulted since such a result would be determined by the nondiscriminatory functioning of the political process. In this case, however, the political process did not function in a nondiscriminatory manner. Blacks, solely because of their race, were excluded from the final decision-making process, (i.e., the Conference Committee); and whites who, for racially discriminatory reasons, opposed the creation of a district which might allow black voters an opportunity to elect a candidate of their choice were entrusted with the decision-making responsibility.

22. The Court's decision does not require the State of Georgia to maximize minority voting strength in the Atlanta area. *See, e.g., Beer v. United States, supra*, 425 U.S. at 140–142, 96 S.Ct. at 1363–1364; *Mississippi v. United States*, 490 F.Supp. 569, 582 (D.D.C.1979). The State is free to draw the districts pursuant to whatever criteria it deems appropriate so long as the effect is not racially discriminatory and so long as racially discriminatory purpose is absent from the process. Act No. 5 is being denied Section 5 preclearance because State officials successfully implemented a scheme designed to minimize black voting strength to the extent possible; the plan drawing process was not free of racially discriminatory purpose.

23. The Plaintiffs have failed to satisfy their burden of demonstrating that the reapportionment was nondiscriminatory in purpose. Thus, the State of Georgia is not entitled to the declaratory relief sought in this litigation.

24. In recognition of the fact that "there must be an election in November for the members of the United States House of Representatives" (May 3, 1982 Opinion of the Georgia Attorney General, at 2–3), the Court will retain jurisdiction of this action to allow the Plaintiffs to submit to this Court within twenty (20) days of the date of this Order, a revised plan for the conduct of said election, which plan satisfies the requirements of the Voting Rights Act.

25. An appropriate Order accompanies these Findings of Fact and Conclusions of Law.

## ORDER

UPON CONSIDERATION of Plaintiffs' and Defendant-Intervenors' Motions for an Order Approving Special Primary and General Election Schedules for Georgia's Fourth and Fifth Congressional Districts, the responses thereto, the hearing held this date, and the entire record herein;

FURTHER, upon consideration of Plaintiffs' agreement to expedite the electoral process by proceeding without further delay (but without prejudice to any appeal that may hereafter be taken with respect to disputed legal issues);

AND FURTHER, upon consideration of the concessions by Defendants and Defendant-Intervenors, at the hearing held this date, that the below-ordered election schedule will not have an unlawful purpose or effect of discriminating on account of race;

THEREFORE, it is by the Court this 24th day of August, 1982,

ORDERED, that the Special Primary, Runoff, and General Elections for Georgia's Fourth and Fifth Congressional Districts shall proceed according to the appended schedule; and it is

FURTHER ORDERED, that the dates and events numbered 4, 6, 7, 9, 10, 11, 12, 13, 17, 18, 19, 20, 21, and 22 may be altered by Plaintiffs as may be required to facili-

tate the electoral process so long as any such alteration(s) does (do) not affect the dates and events numbered 1, 2, 3, 5, 8, 14, 15, 16, and 23; and it is

FURTHER ORDERED, that the dates and events numbered 1, 2, 3, 5, 8, 14, 15, 16, and 23 may not be altered except on order of this Court.

## APPENDIX

### ELECTION SCHEDULE FOR

### 4th & 5th CONGRESSIONAL DISTRICTS

1. **Deadlines for Special Primary** *

1. **August 27**—Publication of "Call"; Qualification Fees Fixed and Published
2. **August 27**—Opening Qualifying Date for Special Primary Candidates
3. **September 8**—Closing Qualifying Date for Special Primary Candidates; Posting of Lists of Candidates by Political Parties; Certification of Political Party Candidates to Secretary of State
4. September 13—Certification of Ballot Form to Superintendent of Elections in Each County
5. **October 5**—Voter Registration Deadline for Special Primary
6. October 7—Preparation of Voting Machines for Use in Special Primary
7. October 9—Filing of Certified List of Electors
8. **October 12**—Delivery of Absentee Ballots to Boards of Registrars
9. October 12—Submission of Names of Poll Watchers to Political Parties
10. October 13—Official Ballot Form Open to Public Inspection
11. October 28—Last Day for Mailing of Absentee Ballots for Special Primary Over 300 Miles
12. October 29—Designation and Certification of Poll Watchers; Testing of Tabulating Machines and Vote Recorders Prior to Special Primary

13. October 31—Last Day for Mailing of Absentee Ballots for Special Primary Within 300 Miles
14. **November 2**—Date of Special Primary; Last Day for Voting Absentee Ballots in Person; Last Day for Receipt of Absentee Ballots Sent by Mail
15. **November 9**—Date of Special Primary Runoff (if necessary)
16. **November 16**—Last Day for Receipt of Absentee Ballots for Special Primary

2. **Deadlines for General Election** *

17. August 27—Circulation of Nomination Petitions to Have Name Placed on General Election Ballot
18. September 8—Filing of Notice of Candidacy and Affidavit by Independent and Political Body (Third Party) Candidates
19. October 22—Nomination Petitions Filed by Independent and Political Body (Third Party) Candidates
20. October 29—Verification of Signatures on Nomination Petitions
21. November 4 **—Certification of Official Ballot Forms by Secretary of State
22. November 4–6 **—Delivery of Absentee Ballots
23. **November 30**—Date of General Election; Last Day for Voting Absentee Ballots in Person; Last Day for Receipt of Absentee Ballots Sent by Mail

## MEMORANDUM OPINION

HARRY T. EDWARDS, Circuit Judge:

This case presents the question whether a congressional election may be scheduled for a date other than the first Tuesday after

---

* Except where specifically indicated, the substantive meaning of each category enumerated in this schedule corresponds with the meaning of the categories enumerated in Exhibit 1 to the Plaintiffs' Motion For an Order Approving Special Primary and General Election Schedules

For Georgia's Fourth and Fifth Congressional Districts.

** These dates should be used if there is no Special Primary Runoff. If a Runoff is necessary, the State may adjust these dates as may be required.

the first Monday in November[1] in order to remedy the discriminatory effects of an electoral procedure found to be unlawful under the Voting Rights Act of 1965.[2] We answer in the affirmative.

Exercising the authority granted to it by section 2 of the Fifteenth Amendment,[3] Congress enacted the Voting Rights Act of 1965 "to rid the country of racial discrimination in voting." *South Carolina v. Katzenbach,* 383 U.S. 301, 315, 86 S.Ct. 803, 811, 15 L.Ed.2d 769 (1966). Section 5 of the Act furthers this goal by prohibiting a covered state or political subdivision from implementing a new voting procedure unless it has obtained a ruling from the United States Attorney General, or a declaratory judgment from this court, that the procedure "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c (1976); *United Jewish Organizations v. Carey,* 430 U.S. 144, 147, 97 S.Ct. 996, 1000, 51 L.Ed.2d 229 (1977).

On August 16, 1982, Georgia, a state that is subject to the section 5 preclearance requirement,[4] requested an order approving revised primary and general election schedules for its Fourth and Fifth Congressional Districts. Because the voting schedules departed significantly from those established by Georgia law for congressional elections, the state was required to demonstrate that the proposal was not discriminatory in either purpose or effect. *Georgia v. United States,* 411 U.S. 526, 538, 93 S.Ct. 1702, 1709, 36 L.Ed.2d 472 (1973); H.R.Rep. No. 196, 94th Cong., 1st Sess. 8 (1975), U.S. Code Cong. & Admin.News, p. 774. On August 24, 1982, we concluded, upon consid-

eration of the entire record, that Georgia had failed to carry its burden of proof, and, *at the state's request,* we specified a schedule for this year's congressional elections. *Busbee v. Smith,* 549 F.Supp. 494 (D.D.C. 1982) (order specifying schedule). We write now to address the state's sole objection to the election schedule that has been implemented.

## I. BACKGROUND

The controversy underlying these proceedings arose from the need, following the 1980 Census, to bring Georgia's congressional apportionment plan into compliance with the one-person, one-vote standard under the Fourteenth Amendment. *Busbee v. Smith,* 549 F.Supp. 494 at 498 (D.D.C.1982). After the Attorney General refused to sanction the first reapportionment plan enacted by the Georgia General Assembly,[5] the state brought a declaratory judgment action under section 5. Faced with weighty evidence of "[o]vert racial statements, . . . conscious minimizing of black voting strength, historical discrimination and the absence of a legitimate nonracial reason for adoption of the plan," *id.* at 517, this court refused to grant declaratory relief and ordered the submission of a new reapportionment plan.

Subsequently, Georgia developed a second plan,[6] and sought a declaratory judgment approving it. At the same time, the state submitted an expedited election schedule to the Attorney General for preclearance. Although this court eventually approved the new reapportionment plan, *Busbee v. Smith,* 549 F.Supp. 494 (D.D.C.1982) (order granting declaratory judgment), the Assistant Attorney General for Civil Rights,

---

1. 2 U.S.C. § 7 (1976) [hereinafter referred to as "section 7"] establishes "[t]he Tuesday next after the 1st Monday in November, in every even numbered year," as the day for congressional elections.

2. 42 U.S.C. §§ 1973–1973bb–1 (1976 & Supp. IV 1980). Congress recently amended the Act and extended its effect. Voting Rights Act Amendments of 1982, Pub.L. No. 97–205, 96 Stat. 131.

3. U.S. Const. amend. XV, § 2.

4. *Georgia v. United States,* 411 U.S. 526, 527– 28, 93 S.Ct. 1702, 1704, 36 L.Ed.2d 472 (1973); 28 C.F.R. pt. 51 app. (1981).

5. *See* Act No. 5 of the 1981 Extraordinary Session of the Georgia General Assembly, *reprinted in* Record (R.) 1.

6. *See* House Bill No. 1 Ex. of the 1982 Extraordinary Session of the Georgia General Assembly, pt. I, *reprinted in* R. 140.

acting for the Attorney General pursuant to 28 C.F.R. § 51.3 (1981), interposed a section 5 objection to the proposed election schedule. Letter from Wm. Bradford Reynolds to Michael J. Bowers (Aug. 12, 1982) (reprinted in R. 143) [hereinafter Reynolds Letter]. In his opinion, that schedule, which called for a special primary on August 31 and a general election on November 2, allowed insufficient time for candidates to qualify and campaign and for voters "to make a reasoned selection among candidates. These consequences," he concluded, "would impact unfairly on black *voters* of the Atlanta area." *Id.* at 2 (emphasis added).

The state then secured this court's approval of an expedited schedule for Congressional Districts 1–3 and 6–10, *Busbee v. Smith,* No. 82–0665 (D.D.C. Aug. 13, 1982) (order approving schedule), and attempted to meet the Justice Department's objections concerning the Fourth and Fifth Congressional Districts by proposing a plan to hold a special primary on September 14 and a general election on November 2. Starting with the premise that "the Congressional elections must be held on November 2, 1982," the state had "worked backwards" from that date in formulating this plan.[7] Beyond that simple statement of its premise, however, the state made *no attempt whatsoever* to demonstrate that the proposed schedule had neither a discriminatory purpose nor a discriminatory effect.[8]

■ Although the state's failure to respond to repeated assertions by the Government and the Intervenors that its schedule would discriminate against black voters arguably is itself persuasive evidence that the schedule would have that effect, we need not rely on the state's silence alone. The reapportionment plan significantly altered the configuration and racial composition of the Fourth and Fifth Congressional Districts, *see* Reynolds Letter, *supra,* at 2, and neither voters nor potential candidates knew where the lines would fall until the state secured section 5 approval on August 24. Under the state's schedule, the primary—arguably the most important election in at least the Fifth District, *see* Tr. 8, 16–17; *cf. United States v. Classic,* 313 U.S. 299, 313–14, 319, 61 S.Ct. 1031, 1036–37, 85 L.Ed. 1368 (1941) (discussing the practical importance of primaries)—was to be held only three weeks later. This schedule not only would have prevented potential candidates from mounting effective campaigns, but more important, would have frustrated voters' attempts to prepare themselves to make a reasoned choice among the candidates. We concluded, therefore, that Georgia's defense of its proposed schedule fell far short of meeting the state's statutory burden of proof.

This conclusion ordinarily would have compelled an order requiring Georgia to submit an acceptable proposal as expeditiously as possible. *See, e.g., City of Port Arthur v. United States,* 517 F.Supp. 987, 1024 (D.D.C.1981) (three-judge court), *prob. juris. noted,* 455 U.S. 917, 102 S.Ct. 1272, 71 L.Ed.2d 457 (1982). Although we have followed such a procedure throughout this litigation, so as to minimize the intrusion of this court into the state's affairs, a different course was taken with respect to the election schedules. At the hearing held on August 24, 1982, the state requested the court to fix an election schedule so as to

**7.** Plaintiffs' Motion for an Order Approving Special Primary and General Election Schedules for Georgia's Fourth and Fifth Congressional Districts (R. 146) at 2.

**8.** "Congress plainly intended that a voting practice not be precleared unless *both* discriminatory purpose and effect are absent." *City of Rome v. United States,* 446 U.S. 156, 172, 100 S.Ct. 1548, 1559, 64 L.Ed.2d 119 (1980) (emphasis in original). The state's attempt to comply with the perceived November 2 election day requirement evinces, at best, a lack of discriminatory "purpose" (but not "effect"). Furthermore, it is noteworthy that the Georgia Legislature explicitly recognized that a November 2 election might be impossible and provided for that contingency. *See* House Bill No. 1 Ex., § 8(a), *reprinted in* R. 140, exhibit A at 8. The state's subsequent reliance on a rigid interpretation of section 7 could therefore be taken to demonstrate an ongoing discriminatory purpose.

avoid undue delays in the electoral process.[9] Neither the Government nor the Intervenors opposed this request.

■ The court acceded to the state's suggestion upon determining that (1) resubmitting the matter to state officials would indeed result in undue delays in the electoral process; and (2) any further delays would likely postpone the general election until the Christmas holiday season and thus reduce voter turnout at the special election, see Tr. 39, and perpetuate the discrimination that tainted the original reapportionment plan. The risks presented, see also note 9 supra, convinced us that a departure from the usual procedure was necessary. Under these circumstances, we concluded that establishing a timetable for the November congressional election did not raise any jurisdictional problems.[10]

## II. DISCUSSION

■ The schedule adopted by this court requires a special primary on November 2 and a general election on November 30. Busbee v. Smith, 549 F.Supp. 494 (D.C.

1982) (order specifying schedule). That schedule, the Attorney General and Intervenors conceded, reduces the discriminatory effect of the Georgia Legislature's prior unlawful conduct to a level that cannot be challenged on constitutional grounds. See Tr. 14–15, 25, 32. It does so, the state agreed, without increasing the cost of the election, without sacrificing voter turnout, and without hampering in any way the ability of the newly elected representatives to participate fully in the 98th Congress. Tr. 37–39. The only objection to the court-ordered schedule was that it precludes the state from holding a general election for its Fourth and Fifth Congressional Districts on November 2.

This objection is grounded in 2 U.S.C. § 7 (1976), which establishes "[t]he Tuesday next after the 1st Monday in November, in every even numbered year," as the day for congressional elections. Section 7, Georgia argues, absolutely requires that the general election be held on November 2. The necessary implication of this argument—that section 7 somehow tempers the injunctive effect of section 5 of the Voting Rights Act—

**9.** In making this request, the state (1) did not dispute the persuasive arguments of the Government and the Intervenors that allowing more time for the election than had been initially proposed by the state was necessary in order to reduce the effects of the state's earlier unlawfully discriminatory reapportionment plan, see Tr. 14–15, 20–21, 25; (2) offered no legitimate justification for a primary election on a date before November 2 or a general election on November 2; and (3) agreed that any extended delay of the general election (to a date in December of 1982) would seriously hamper the ability of the elected candidates to represent their constituencies.

**10.** Cf. City of Richmond v. United States, 422 U.S. 358, 370, 95 S.Ct. 2296, 2303, 45 L.Ed.2d 245 (1975); City of Petersburg v. United States, 354 F.Supp. 1021, 1031 (D.D.C.1972) (three-judge court) (per curiam), aff'd mem., 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973), and aff'd sub nom. Diamond v. United States, 412 U.S. 901, 93 S.Ct. 2290, 36 L.Ed.2d 967 (1973) (district courts are empowered to set conditions for approval of annexation).

We recognize that in Beer v. United States, 374 F.Supp. 357, 361–63 (D.D.C.1974) (three-judge court) (per curiam), it was held that this court lacked jurisdiction to grant nonincumbent candidates' petition for a scheduling of

elections. However, the holding in Beer in no way undermines the jurisdictional finding made in this case. Because the state in Beer had not sought section 5 approval of a new election schedule, the matter of scheduling was a "tangential" issue that "could best be handled in local district courts." Id. at 362. Here, however, the election itself must be approved under section 5, and this court's clear authority to reject it implies a corresponding authority to specify a schedule—especially pursuant to a request of the state—that would be nondiscriminatory in purpose and effect. See City of Richmond v. United States, 376 F.Supp. 1344, 1357–59 (D.D.C.1974) (three-judge court), vacated and remanded on other grounds, 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975), where the court refused to "assent to any language in the Beer I opinion [374 F.Supp. 357] which ... suggest[s] that this court has jurisdiction only to grant or deny a declaratory judgment sought by a covered state or its subdivision. Such a limitation on our power would remove from us 'the broad equitable jurisdiction that inheres in courts' to give effect to the policy of the legislature which they oversee." Id. at 1359 (quoting Porter v. Warner Holding Co., 328 U.S. 395, 403, 66 S.Ct. 1086, 1091, 90 L.Ed. 1332 (1946)).

is demonstrably incorrect. Our examination of the legislative history of section 7 and its companion provision, 2 U.S.C. § 8 (1976), suggests, moreover, that a postponement of the general election in the unusual situation presented here would not violate Congress' intent in the enactment of section 7.

### A. The Primacy of the Voting Rights Act

As construed by the state, section 7 would squarely conflict with section 5 of the Voting Rights Act in a large class of cases.[11] If the Attorney General refuses to preclear a proposed change in a covered state's voting procedures and this court does not grant declaratory relief, section 5 enjoins any election using the new procedure. 42 U.S.C. § 1973c (1976); *Beer v. United States,* 374 F.Supp. 357, 362 (D.D.C.1974) (three-judge court) (per curiam). Courts often supplement this automatic injunction by spelling out the statutory prohibition in an injunction of their own. *See, e.g., Allen v. State Board of Elections,* 393 U.S. 544, 572, 89 S.Ct. 817, 835, 22 L.Ed.2d 1 (1969); *Herron v. Koch,* 523 F.Supp. 167, 173–74 (E.D.N.Y.1981) (three-judge court) (per curiam); *Heggins v. City of Dallas,* 469 F.Supp. 739, 742–43 (N.D.Tex.1979) (three-judge court) (per curiam); Derfner, *Racial Discrimination and the Right to Vote,* 26 Vand.L.Rev. 523, 577–78 & n. 243 (1973). In many cases, these injunctions simply require the continued use of the pre-existing voting procedures, and sections 5 and 7 do not clash. In cases like this one, however, where it is no longer feasible, due to either the passage of time or an independent con-

stitutional requirement, to use the old procedures, section 5 of the Voting Rights Act might well prohibit the state from holding its congressional elections on the date specified by 2 U.S.C. § 7.

Since the mere imminence of the statutorily prescribed date cannot affect the determination whether a proposed voting procedure is discriminatory in purpose or effect, Georgia's objection to the court-ordered election schedule is valid only if 2 U.S.C. § 7 limits the duration of section 5's automatic injunction. In the absence of any evidence that Congress intended to so cabin section 5's injunctive effect, this conclusion is untenable.[12] Section 7 was originally enacted in 1872, Act of Feb. 2, 1872, ch. 11, § 3, 17 Stat. 28, 28, and was last amended in 1934, Act of June 5, 1934, ch. 390, § 2, 48 Stat. 879, 879. Section 5, on the other hand, was enacted in 1965. Voting Rights Act of 1965, Pub.L. No. 89–110, tit. I, § 5, 79 Stat. 437, 439. When the usual rule of statutory construction—"where there is a conflict between an earlier statute and a subsequent enactment, the subsequent enactment governs," *Interstate Commerce Commission v. Southern Railway,* 543 F.2d 534, 539 (5th Cir.1976)—is applied to these statutes, it makes evident that section 7 in no way limits section 5's command. *See United States v. Tynen,* 78 U.S. 88, 92, 20 L.Ed. 153 (1870); *Hines, Inc. v. United States,* 551 F.2d 717, 725 (6th Cir. 1977); *Payne v. Washington Metropolitan Area Transit Commission,* 134 U.S.App.D.C. 321, 415 F.2d 901, 908 (D.C.Cir.1968); 2A C. Sands, *Statutes and Statutory Construction* § 51.02 (4th ed. 1973).[13]

---

11. Courts must strive to avoid such conflicts between statutes whenever possible. *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). This principle at once demonstrates the incorrectness of Georgia's interpretation and supports the construction set forth in Part II–B *infra.*

12. Although Congress apparently did not consider the issue raised here, the limited legislative history suggests precisely the opposite conclusion. *See* H.R.Rep. No. 196, 94th Cong., 1st Sess. 8 (1975) ("Under Section 5 the jurisdiction submitting the proposed change bears

the burden of proving nondiscriminatory purpose and effect and the change *cannot be implemented until* the Section 5 review requirements have been met.") (emphasis added); H.R.Rep. No. 397, 91st Cong., 1st Sess. 7 (1969), U.S.Code Cong. & Admin.News 1970, p. 3277 (section 5 prevents covered states from enforcing voting changes "unless and until" they obtain preclearance).

13. Although this canon of construction is "not [a] rule[ ] of law but merely [an] axiom[ ] of experience," *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221, 73 S.Ct. 227,

Mindful of the dangers of unthinking reliance on a rule of statutory construction, we have also analyzed the effect of the competing interpretations on the attainment of the congressional purposes underlying sections 5 and 7. If section 7 limited the duration of section 5's injunctive effect, Congress' intention that black voters not "be made to wait through election after election under untested and potentially discriminatory laws," *Horry County v. United States,* 449 F.Supp. 990, 997 (D.D.C.1978) (three-judge court), would be frustrated.[14] States, such as Georgia, that are required by law to revamp their voting procedures could, by delaying the revision until well into an election year, force the court to choose between two unlawful provisions. This result, of course, would be wholly inconsistent with Congress' desire that "the States and subdivisions, rather than citizens seeking to exercise their rights, bear the burden of delays in litigation." *Perkins v. Matthews,* 400 U.S. 379, 396, 91 S.Ct. 431, 440, 27 L.Ed.2d 476 (1971).

Departing from section 7's requirement under exigent circumstances like those present here, however, would not prevent the realization of that statute's purpose. Section 7 was enacted, the Supreme Court has observed, "to remedy more than one evil arising from the election of members of Congress occurring at different times in the different States." *Ex parte Yarbrough,* 110 U.S. 651, 661, 4 S.Ct. 152, 157, 28 L.Ed. 274 (1884). But those evils—unduly benefiting certain states and political parties and unnecessarily burdening voters and politicians, *Cong. Globe,* 42nd Cong., 2d Sess. 141 (1871) (remarks of Rep. Butler)—are not perpetuated by our holding that section

5 of the Voting Rights Act overrides the seemingly absolute language of section 7. Although our schedule does impose the burdens of a double election on employed voters, every other proposed schedule, *including those that followed section 7's command,* shared that disadvantage. The passage of time, moreover, has mitigated those burdens to the extent that "the poor laboring man" no longer "loses his day's work" by going to the polls. *Id.*

We hold, in short, that a court's duty under section 5 of the Voting Rights Act to disapprove changes in voting procedures that discriminate in purpose or effect is unaltered by any supposed conflict with 2 U.S.C. § 7. Any other conclusion would fly in the face of both elementary principles of statutory construction and Congress' intent as manifested by the purposes underlying the respective statutes.

### B. The Absence of a Conflict

■ The primacy of section 5 notwithstanding, Georgia's objection must still fail. Courts must adopt harmonizing constructions whenever possible and we can easily reconcile sections 5 and 7 by construing the latter in light of its companion provision, 2 U.S.C. § 8.

■ Although states ordinarily should conduct congressional elections on the date established by section 7, federal law contemplates that those elections may, under certain circumstances, be held at other times. In some years, Congress has recognized, a state may fail to elect its representatives at the prescribed time. Section 8 provides for that contingency:

229, 97 L.Ed. 260 (1952), it rings especially true when the later statute was enacted pursuant to the implementation provision of one of the Civil War Amendments. *Cf. City of Rome v. United States,* 446 U.S. 156, 179, 100 S.Ct. 1548, 1559, 64 L.Ed.2d 119 (1980) (Constitutional "principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments 'by appropriate legislation.'"); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976)

("[W]e think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment.") (citation omitted).

14. The importance of section 5 to the overall scheme of the Voting Rights Act cannot be gainsaid. *See* S.Rep. No. 295, 94th Cong., 1st Sess. 19, *reprinted in* 1975 U.S.Code Cong. & Ad.News 774, 785; H.R.Rep. No. 196, *supra* note 12, at 8–11.

The time for holding elections in any State, District, or Territory for a Representative or Delegate to fill a vacancy, *whether such vacancy is caused by a failure to elect at the time prescribed by law,* or by the death, resignation, or incapacity of a person elected, may be prescribed by the laws of the several States and Territories respectively.

2 U.S.C. § 8 (1976) (emphasis added). We construe this section to mean that where exigent circumstances arising prior to or on the date established by section 7 preclude holding an election on that date, a state may postpone the election until the earliest practicable date. In this case, for example, Georgia will "fail[ ] to elect at the time prescribed by law" because its purposefully discriminatory conduct prevented it from securing section 5 approval for constitutionally required changes in its voting procedures. As a result, we believe, section 8 permits a reasonable postponement of the elections in the Fourth and Fifth Congressional Districts.

■■■ The two possible objections to this conclusion are unpersuasive. Abandoning the interpretation apparently adopted by its Legislature, *see* note 8 *supra,* Georgia now argues that section 8 is inapplicable because no vacancy will arise until the terms of the current representatives expire on January 3, 1983, *see* U.S. Const. Amend. XX, § 1. A simple reading of the statute, which clearly indicates that a failure to elect gives rise to

a vacancy and in no way suggests that a state cannot choose representatives until January after failing to elect them in November, is enough to refute this contention.

Section 8's legislative history bolsters this refutation. As originally enacted, the statute from which section 8 derived provided that

if, upon trial, there shall be a failure to elect . . . upon the day hereby fixed and established for such election, . . . an election shall be held to fill any *vacancy caused by such failure* . . . at such time as is or may be provided by law for filling vacancies in the State or Territory in which the same may occur.

Act of Feb. 2, 1872, ch. 11, § 4, 17 Stat. 28, 29 (emphasis added). Even more clearly than does the present section 8, this language suggests that, in Congress' view, a vacancy arose upon a failure to elect and not on the expiration of the terms of the incumbent representatives. When one considers that those terms did not expire until March 4 when section 8's predecessor was enacted, *see* Act of Feb. 2, 1872, ch. 11, § 3, 17 Stat. 28, 28 (successor statute amended 1934), this conclusion seems inescapable. *Cf. In re Congressional Election,* 15 R.I. 624, 626, 9 A. 224, 225 (1887) (failure to elect imposed duty on legislature to order new election, either before or after the expiration of previous representative's term).[15]

The second possible objection to our interpretation must also be rejected. Pointing

---

**15.** Because the current language of section 8 first appeared in the Revised Statutes of 1874, R.S. § 26, the original enactment is of "great value" in its interpretation. Dwan & Feidler, *The Federal Statutes—Their History and Use,* 22 Minn.L.Rev. 1008, 1015 (1938). Although the Supreme Court has rejected "the flawed premise that Congress did not intend to change the meaning of existing laws when it revised the statutes in 1874," *Maine v. Thiboutot,* 448 U.S. 1, 8 n. 5, 100 S.Ct. 2502, 2506 n. 5, 65 L.Ed.2d 555, it has done so in contexts where it found evidence that "Congress was aware of what it was doing." *Id.* at 8, 100 S.Ct. at 2506. As a general proposition, it remains true that the Revised Statutes should "not lightly . . . be read as making a change." *United States v. Sischo,* 262 U.S. 165, 169, 43 S.Ct. 511, 512, 67 L.Ed. 925 (1923) (Holmes, J.); *see Maine v. Thiboutot,* 448 U.S. at 14, 100 S.Ct. at 2510

(Powell, J., dissenting); *accord Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 624–39, 99 S.Ct. 1905, 1919–27, 60 L.Ed.2d 508 (1979) (Powell, J., concurring). This is especially true where, as here, the revisers placed no marginal comments suggesting an amendment next to the section, 1 Revision of the United States Statutes as Drafted by the Commissioners Appointed for that Purpose 36–37 (1872); *see Maine v. Thiboutot,* 448 U.S. at 17 n. 4, 100 S.Ct. at 2510 n. 4 (Powell, J., dissenting), and the revision was not discussed on the floor of either the House or the Senate, *see* 2 Cong.Rec. 646–50, 819–29, 849–58, 995–1001, 1027–31, 1206–12, 1249–54, 1414–17, 1460–62, 1611–20, 1657–62, 1789–95, 1819–25, 1968–76, 2005–13, 2251–55, 2709–14, 4284–86 (1874). It would be difficult to conclude, therefore, that Congress intended to change the meaning of the provision on vacancies in 1874.

to the phrase, "upon trial," in section 8's predecessor, one could argue that the only "failure to elect" contemplated by Congress was the failure of any candidate to obtain the requisite majority of the votes cast on the date established by section 7's forerunner. Although the 42nd Congress could not have anticipated a "failure to elect" engendered by a section 5 injunction, interpreting that phrase as encompassing such a failure does *no* violence to Congress' intent. *See* Part II–A *supra.* By way of analogy, Congress did not expressly anticipate that a natural disaster might necessitate a postponement, yet no one would seriously contend that section 7 would prevent a state from rescheduling its congressional elections under such circumstances. By acknowledging the modern-day reality that the Voting Rights Act may sometimes result in a "failure to elect at the time prescribed by law," we reach the conclusion that sections 5 and 7 are "capable of co-existence," *Morton v. Mancari,* 417 U.S. at 551, 94 S.Ct. at 2483, because section 8 creates an exception to section 7's absolute rule in a limited class of cases.

## III. CONCLUSION

For the foregoing reasons, we hold that Georgia need not conduct this year's congressional elections in the Fourth and Fifth Districts on November 2 and that 2 U.S.C. § 7, in any event, alters neither the responsibilities imposed on this court by section 5 of the Voting Rights Act nor the remedial authority accorded us by the Act.