The State of GEORGIA, Plaintiff,

v.

John ASHCROFT, et al., Defendants.

No. Civ.A. 01–2111 (EGS HTE LFO).

United States District Court,
District of Columbia.

June 3, 2002.

John D. Ashcroft, Atty. Gen., Ralph F. Boyd, Jr., Asst. Atty. Gen., Civil Rights Div., Joseph D. Rich, Robert A. Kengle, David J. Becker, James Thomas Tucker, Bruce I. Gear, James D. Walsh, Dept. of Justice, Voting Section/Civ. Rights Div., Washington, DC, for Defendants.

Thurbert E. Baker, Atty. Gen. of the State of Georgia, Dennis R. Dunn, Sr. Asst. Atty. Gen., State Law Dept., Atlanta, GA, Mark H. Cohen, Sp. Asst. Atty. Gen.,

Troutman Sanders, L.L.P., Atlanta, GA, David F. Walbert, Sp. Asst. Atty. Gen., Parks, Chesin, Walbert & Miller, P.C., Atlanta, GA, Thomas Sampson, Sr., Sp. Asst. Atty. Gen., Thomas, Kennedy, Sampson & Patterson, Atlanta, GA, Stuart Fries Pierson, Sp. Asst. Atty. Gen., Troutman Sanders, Washington, DC, for Plaintiff.

Lee T. Ellis, Jr., E. Mark Braden, Baker & Hostetler, L.L.P., Washington, DC, Frank B. Strickland, Anne W. Lewis, Strickland Brockington Lewis L.L.P., Atlanta, GA, for Defendant–Intervenors.

BEFORE: EDWARDS, Circuit Judge, SULLIVAN, District Judge, and OBERDORFER, Senior District Judge.

Opinion for the court filed by District Judge SULLIVAN, in which Circuit Judge EDWARDS and Senior District Judge OBERDORFER join.

Concurring opinion filed by Senior District Judge OBERDORFER.

SULLIVAN, District Judge.

On April 5, 2002, the court declined judicial preclearance to Georgia Act No. 1EX6, a plan for redistricting of the Georgia State Senate. However, at the request of the State of Georgia, this court maintained jurisdiction of the case and permitted the State to file a new reapportionment plan for the Senate districts. The State now asks this court to enter a declaratory judgment pursuant to Section 5 of the Voting Rights Act that a revised Senate redistricting plan, Georgia Act No. 444, does not "have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or membership in a language minority group. 42 U.S.C. § 1973c.

## I. Procedural History

On April 5, 2002, this court issued an Opinion and Order ("Opinion") granting the State of Georgia a declaratory judgment under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, with respect to the Congressional and State House redistricting plans enacted during the 2001 special session of the Georgia General Assembly. *See* Civil Action No. 01–2111, April 5, 2002 Op. & Order. That same Opinion denied the State's motion for declaratory judgment under Section 5 with respect to the State Senate redistricting plan enacted during the 2001 special session, Act No. 1EX6 ("2001 plan").

On April 8, 2002, the State of Georgia requested that this court amend its judgment of April 5, 2002 for the purpose of retaining jurisdiction to consider a revised Senate Redistricting Plan. The United States filed a statement of non-opposition to the State's motion. The defendant-intervenors filed a response to the motion arguing that retention of jurisdiction would be improper and that plaintiff was required to file a new lawsuit in this court, if it intended to seek judicial preclearance. On April 9, 2002, in recognition of the fact that the qualifying period for candidates for the Georgia State Senate is scheduled to be held from June 19 to June 21, the court modified its judgment and retained jurisdiction to permit plaintiff to submit a revised plan for the redistricting of the Georgia State Senate within twenty days.

On April 15, 2002, the defendant-intervenors filed a motion for clarification of the order amending judgment, essentially asking the court to confirm that the burden of proof remained on the State to demonstrate that the revised plan did not violate Section 5.

On April 17, 2002, the State filed the revised Senate redistricting plan ("2002 plan"), passed by the Georgia General As-

sembly and signed into law as Act No. 444 on April 11, 2002 by the Governor of Georgia. The State, in accordance with court order, also filed a memorandum in support of the plan. At an April 18, 2002 status hearing, plaintiff represented that it did not intend to submit any additional evidence in support of the revised plan and that no discovery was needed. The court ordered the defendants and defendant-intervenors to notify the court in their responses to the plaintiff's memorandum if they believed that additional discovery was needed. The United States indicated that it no longer contended that the Senate plan violated Section 5, while the defendant-intervenors argued that the State had again failed to meet its burden. No party requested additional discovery or sought to file new evidence with the court.

At the April 18, 2002 status hearing, the court also inquired of the parties whether there was a need to have the plaintiff file a new complaint, or to have the parties file motions for summary judgment. Relying on *Busbee v. Smith*, 549 F.Supp. 494 (D.D.C.1982),[1] the parties argued that no procedural impediments barred the court from resolving the merits of the case on the basis of the plan and the responses to the plan.

The plaintiff and defendant-intervenors both argue that the evidentiary record developed during the court's review of the 2001 Senate redistricting plan supports their positions. However, the parties' initial briefs failed to point to record evidence to support their positions. The cursory nature of the parties' briefs prompted the court to require the parties to file proposed findings of fact and conclusions of law explicitly identifying the evidence upon which the parties relied.

In a conference call on May 17, 2002,[2] at the suggestion of the court, the parties agreed that, in the event that the court concluded that the evidence raised a genuine issue of material fact, thus precluding the granting of summary judgment, the court could resolve the case as a stipulated trial on the record. *See also Benoit v. McKenzie*, Civ. Action No. 84–2657, 1988 WL 4238 (D.D.C. Jan.5, 1988).

The court treats the plaintiff's submission of the revised Senate redistricting plan as a new complaint for declaratory judgment. Retention of jurisdiction was appropriate and in the interests of justice insofar as a new complaint would have come to this three-judge court as related to the court's previous review of the State's Congressional and State Senate and House redistricting plans. As discussed below, the court construes the case as a stipulated trial on the entire record after finding that genuine issues of material fact preclude entry of summary judgment.

## II. Factual Background

The court's April 5, 2002 opinion contains a lengthy discussion of the demographics of the State of Georgia. Therefore, in this section, the court focuses its attention on the differences between the 2001 Senate redistricting plan and the revised 2002 plan.

---

1. The *Busbee* court, noting the imminence of Congressional elections in November, retained jurisdiction for twenty days to allow the State to submit a revised plan. 549 F.Supp. at 518. After receiving no opposition to the revised plan from defendants or defendant-intervenors, the *Busbee* court issued a short order granting declaratory judgment for the State. *See Busbee v. Smith*, Civ. Action No. 82–0665, Order, Aug. 24, 1982.

2. At this same conference call, the court indicated that oral argument on the revised plan would not be necessary.

The April 5, 2002 opinion scrutinized the redistricting proposed for thirteen benchmark Senate Districts with majority African American populations and Senate District 34, which would have become a majority African American district under the 2001 plan. With the exception of Senate Districts 2, 12 and 26, the demographics of these districts are the same under the 2001 plan and under the revised 2002 plan.

The following chart summarizes the percentages of Black population ("BPOP"),[3] Black voting age population ("BVAP") and Black registered voters ("BREG") in Senate Districts 2, 12 and 26 under the benchmark plan ("BM"), the 2001 plan ("2001") rejected by the court and the 2002 plan ("2002") submitted for review.

| S.D. | BPOP | | | BVAP | | | BREG | | |
|------|------|------|------|------|------|------|------|------|------|
| | BM | 2001 | 2002 | BM | 2001 | 2002 | BM | 2001 | 2002 |
| 2 | 65.46 | 55.60 | 59.47 | 60.58 | 50.31 | 54.50 | 62.38 | 48.50 | 55.80 |
| 12 | 59.88 | 54.01 | 58.66 | 55.43 | 50.66 | 55.04 | 52.48 | 47.76 | 51.58 |
| 26 | 67.24 | 55.36 | 60.32 | 62.51 | 50.80 | 55.45 | 62.93 | 48.68 | 54.70 |

*See* Pl.'s Proposed Findings of Fact & Conclusions of Law ("PPFF") at ¶ 28.

The benchmark plan has thirteen districts with majority African American populations. These same thirteen districts have populations in which the majority of registered voters are African American. Twelve benchmark districts have majorities of BVAP ranging from 54.73% to 88.91%, and benchmark Senate District 44 has a BVAP of 49.62%.

The 2002 plan proposes thirteen districts with majority African American populations. Eleven proposed districts would have majorities of African American registered voters. Proposed Senate Districts 22 and 34 would have populations where registered voters were respectively 49.44% and 49.50% African American. Under the 2002 plan, according to Georgia's calculation of BVAP, thirteen districts would have

majority BVAPs, ranging from 50.54% to 64.14%.

The BVAP of Senate District 34, the newly created majority-minority district, falls slightly below 50% to 49.53% when BVAP is calculated according to the United States' methodology. *See* U.S.Ex. 110; April 5, 2002 Op. & Order at 65. Consequently, pursuant to the United States' calculations, there would be twelve districts with majority BVAPs under the revised plan.

The boundaries of Senate Districts 2, 12 and 26, as drawn by the 2002 plan differ in several significant ways from those drawn by the 2001 plan. Essentially, the districts have been created with an eye toward maintaining minority voting strength by keeping within the districts majority African American precincts that fall within the current benchmark districts. In addition, the revised plan's districts would not in-

---

3. As indicated in the court's April 5 opinion, plaintiff and the United States dispute the method of calculating the African American population of Georgia. *See* Opinion at 22–23. The court will refer to BPOP and BVAP calculated pursuant to Georgia's method of construing the census data. The United States has not presented any additional evidence; consequently, the court is unable to determine the relevant BPOP and BVAP percentages under the revised plan pursuant to the Attorney General's method of interpreting the census data.

clude majority white precincts that are not within the benchmark districts, but which the 2001 plan had proposed to add to Districts 2, 12 and 26.

In particular, unlike the 2001 plan, the 2002 plan would not include Tybee Island, Whitemarsh and Isle of Hope in Senate District 2. *See* Pl.Ex. 31A. The Port Wentworth community, as well as the majority African American precincts of Secondary Tech, Garden City Community Center and Wilder Memorial Baptist, would be included in Senate District 2 under the revised plan. *Id.*

The revised plan would keep within Senate District 12 three precincts with majority African American registration figures, which had been removed under the 2001 plan. In addition, the predominantly white precincts of Raiford, Putney and Century, included in Senate District 12 under the 2001 plan, would not be included in the revised District 12. *Compare* Pl.Ex. 4A *with* Pl.Ex. 32A.

In Senate District 26, the revised plan would include significant portions of Twiggs and Wilkinson counties, including the City of Jeffersonville, which have substantial African American populations. Pl. Ex. 33A. Several predominantly rural, white precincts in Monroe, Butts, Jones and Jasper Counties are not included in the 2002 plan's Senate District 26. These precincts had been included in the 2001 plan's proposed district.

### III. Standard of Review

■ As an initial matter, the court addresses the plaintiff's repeated assertions that some different standard or quantum of proof is applicable because this case is now in a "remedial" posture. Plaintiff, with the agreement of the United States and defendant-intervenors, initially cited *Busbee v. Smith* for the proposition that this court could properly retain jurisdiction in order to permit the State to submit a revised redistricting plan. 549 F.Supp. 494 (D.D.C.1982). However, plaintiff also relies on *Busbee* to support a conclusion that this matter is in a "remedial" posture. While continuing to recognize that it bears the burden of proof, the State suggests that the "remedial" nature of the court's present review mandates a more flexible procedural and evidentiary standard.

The court wholly rejects the idea that its current review may be in any way less searching or comprehensive than its former review of the 2001 plan. Indeed, on this point *Busbee* is instructive. The *Busbee* court refused to preclear Georgia's Congressional redistricting plan because it found that the boundary between the Fourth and Fifth Congressional Districts, which essentially bifurcated a concentrated African American population, had been drawn with a discriminatory purpose. 549 F.Supp. at 517–18. When the State suggested that the court's order applied only to the Fourth and Fifth Districts, and manifested an intent to go forward with elections in the remaining Congressional Districts, the Court clarified that it had found that the redistricting plan *"as a whole"* was in violation of Section 5 and unenforceable. Civ. Action 82–0665, Order, Aug. 2, 1982, at 2 (emphasis in original). Thus, while the State legislature ultimately chose to redraw only the Fourth and Fifth Districts, the court explicitly recognized the possibility that a revised plan might affect other districts." *Id.* Similarly, we have emphasized that, although we have focused on three individual Senate Districts, we are obligated to consider whether the plan as a whole contravenes Section 5. This obligation is unchanged by the submission of a second, revised plan.

Plaintiff bears the burden of demonstrating by a preponderance of the evidence that the 2002 Senate redistricting

plan does not have a retrogressive purpose and will not have a retrogressive effect. *See City of Pleasant Grove v. United States,* 479 U.S. 462, 469, 107 S.Ct. 794, 93 L.Ed.2d 866 (1987). "A preponderance standard . . . requires merely that the fact-finder believe that the existence of a fact is more probable than the non-existence of that fact." *United States v. Smith,* 267 F.3d 1154, 1161 (D.C.Cir.2001). In other words, " '[t]he burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [the trier of fact] may find in favor of the party who has the burden to persuade the [court] of the fact's existence.' " *Metropolitan Stevedore Co. v. Rambo,* 521 U.S. 121, 137 n. 9, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) (quoting *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.,* 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)). Thus, for the plaintiff to succeed at a stipulated trial, this court need only find that the evidence that the revised Senate redistricting plan will not have a retrogressive effect is more convincing than the evidence offered to prove that the plan will result in retrogression. *See id.* (citing *Greenwich Collieries v. Director, OWCP,* 990 F.2d 730 (3d Cir.1993)).

Because we find that there are genuine issues of material facts in dispute that preclude the entry of summary judgment, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), we treat the case as a stipulated trial on the entire record. In considering the case as a stipulated trial, the court takes on the role of fact-finder. Thus, the State may prevail if the court determines that the evidentiary record supports a finding that it is more probable than not that the revised redistricting plan for the State Senate will not violate Section 5.

## IV. Analysis

Plaintiff seeks a declaratory judgment pursuant to Section 5 that the 2002 redistricting plan for the Georgia State Senate does not "have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or membership in a language minority group. 42 U.S.C. § 1973c. *Beer v. United States* teaches that Section 5 mandates that a voting change submitted for preclearance not be retrogressive in its effect; a covered jurisdiction may not enact a voting change that directly or indirectly diminishes the opportunities of African American voters to exercise their electoral power. 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976). Similarly, *Reno v. Bossier Parish School Board* instructs that only a retrogressive purpose will violate Section 5. 528 U.S. 320, 341, 120 S.Ct. 866, 145 L.Ed.2d 845 (*"Bossier II"*). We address the effect and purpose prongs of the Section 5 inquiry in turn.

### A. Non-retrogressive Effect

### 1. Legal Standard

The court is faced with the challenge of predicting the effect of the revised Senate redistricting plan on African American voting strength in Georgia. Plaintiff has offered little additional evidence in support of the revised plan, while defendant-intervenors have chosen to present no new evidence, maintaining only that the State has failed to meet its burden of proof. The United States does not contend that the revised plan has a retrogressive effect and has presented no additional evidence.

Although the Attorney General does not contend that the revised plan is retrogressive, the State has chosen not to submit the plan to the Attorney General for administrative preclearance. For the reasons outlined in the April 5, 2002 majority

opinion, the court has determined that the failure of the Attorney General to object to a plan does not moot the controversy, and that the court must hold the plaintiff to its burden of demonstrating that the proposed plan does not have a retrogressive effect or purpose.

We have previously rejected the notion that the court's retrogression analysis is limited to a few disputed districts, holding that a Section 5 action necessarily calls for an analysis of the entire plan and its predicted effect. April 5, 2002 Op. & Order, at 107. Nevertheless, the April 5, 2002 opinion focused on three proposed Senate Districts where there was evidence of racially polarized voting, which, when coupled with the demographics of the proposed districts, we found likely to result in a retrogressive effect.

Our previous opinion discusses at length the appropriate legal standard for assessing retrogression, and we review this standard here only briefly. Section 5 is a mandate that "the minority's opportunity to elect representatives of its choice not be diminished, directly or indirectly, by the State's actions." *Bush v. Vera,* 517 U.S. 952, 983, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). Whether a given plan will have a retrogressive effect is a fact-specific inquiry that focuses on whether a proposed voting change will diminish minority voting strength throughout the given jurisdiction.

As discussed in the April 5, 2002 Opinion, courts have frequently used the number of majority-minority districts as a shorthand for measuring minority voting strength. However, we also noted the dualistic nature of majority-minority districts. Such districts may increase minority voting strength where voting patterns are such that only a majority or supermajority of minority voters will permit the election of minority candidates of choice. Yet, they may also diminish or stagnate minority voting strength by "packing" minority voters into a small number of districts, thus foreclosing the voters' ability to influence the outcome of elections in a greater number of districts.

Thus, finding that the "shorthand" method of counting majority-minority districts would not necessarily reflect a plan's predicted effect on minority voting strength, the court undertook a careful, fact-intensive analysis of the full range of evidence presented to it. In particular, the court considered demographic evidence regarding the proposed plan, evidence of racial voting patterns and lay testimony regarding the predicted effect of the plan. In addition, the court rejected the State's argument that the proposed Senate plan was an inevitable result of compliance with the constitutional principle of one person, one vote.[4] The court, however, was significantly hampered in its consideration of the issues by the failure of the parties to submit expert testimony addressing the relative effect of the 2001 plan on African American voting strength throughout the State.

## 2. Opportunities to elect candidates of choice

The crux of the court's finding that the 2001 Senate redistricting plan was more

---

4. The State and the defendant-intervenors appear to view the court's discussion of the constitutional principle of one person, one vote as an evidentiary factor to consider in determining whether the plan is retrogressive. However, the court's concern with one person, one vote principles stems from the State's argument, made in its briefs in support of the first Senate redistricting plan, that the decrease in BVAP in several of the majority-minority districts was inevitable and mandated by the constitutional principle of one person, one vote. The court rejected this "defense," finding that the State had offered no proof that such decreases were necessary for constitutional compliance, and that, indeed, the evidence suggested otherwise.

likely than not to diminish African American voting strength lies in the interplay between decreases in several majority-minority districts' BVAPs and evidence of significantly racially polarized voting. Although the court has commented extensively on this relationship between racially polarized voting and the demographics of the proposed districts, the State and defendant-intervenors would have the court analyze these two factors in isolation from one another. Such an approach misses the mark because it fails to explain the ultimate effect of the plan on African American voting strength in the State. As the court noted in its April 5, 2002 Opinion, "[w]here there is evidence of racially polarized voting, a redistricting plan that reduces African American votes in a district with no offsetting gains elsewhere raises the specter of impermissible retrogression." April 5, 2002 Op. & Order, at 5.

Nevertheless, contrary to the suggestion of defendant-intervenors, the State need not prove the "absence" of racially polarized voting. Clearly, this Section 5 does not require. Rather, the State must demonstrate that, to the extent that racially polarized voting *does* exist, the configuration of the proposed Senate Districts is not such that the plan, as a whole, will diminish African American voting strength.

The presence of racially polarized voting, and its effect on the redrawn districts, is a complicated matter. Nevertheless, as we have already remarked, the court's task is made more difficult by the failure of the parties to present evidence that would explain with precision how the degree of racially polarized voting found by Dr. Engstrom will affect minority voting strength in districts with the demographics proposed by the 2002 redistricting plan.

When compared with the 2001 proposed Senate plan, only the boundaries, and hence the demographics, of Senate Districts 2, 12 and 26 have been altered in the revised 2002 plan. The court previously expressed concern that the BVAPs in five districts, including districts 2, 12 and 26, were reduced to bare majorities. However, the court focused its attention on districts 2, 12 and 26 because there was evidence of racially polarized voting in those districts that suggested that the accompanying reduction of BVAP to bare majorities would result in a retrogressive effect. The court held that the State had failed to meet its burden because it was more likely than not that racially polarized voting in these three districts with bare majorities of BVAP would result in a state-wide diminution of minority voting strength.

There is still cause for concern under the 2002 redistricting plan. The 2002 plan calls for bare majorities of BVAP in Senate Districts 15 and 34, and a decrease of 12% that brings Senate District 22's BVAP to 51.51%. While there are thirteen districts with majority BVAP according to the State's calculations of BVAP, the BVAPs in eight of these proposed districts would decrease as compared with the benchmark plan. These decreases range from 26.28% to 0.39%.[5]

On the other hand, the revised plan differs from the 2001 proposed plan in significant ways. Of the majority-minority districts created under the 2001 plan, six of the districts had BVAPs between 50.3%

---

**5.** Specifically, a comparison of the demographics of Senate districts (S.D.) under the benchmark plan and the revised 2002 plan shows the following changes in the districts' BVAP: in S.D. 43, –26.28%; in S.D. 38, –16.32%; in S.D. 35, –15.33%; in S.D. 44, – 14.91%; in S.D. 22, –12.00%; in S.D. 55, –11.76%; in S.D. 15, –11.18%; in S.D. 26, –7.06%; in S.D. 10, –6.52%; in S.D. 2, –6.08%; in S.D. 36, –3.42%; in S.D. 12, –0.39%; in S.D. 39, 1.81%; in S.D. 34, 16.58%. U.S.Ex. 118; PPFF ¶ 28; Pl.Ex. 25, app. III.

and 51.5%. *See* April 5, 2002 Op. & Order at 96. The revised plan has only two districts in this range, Senate District 15 and the newly created majority African American district, Senate District 34. Pl. Ex. 30C. Senate District 22 is just slightly above this range with a BVAP of 51.51%. There are 10 districts in the revised plan with a BVAP over 54%. While under the benchmark plan, all of the majority-minority districts had BVAP percentages greater than 54%, only seven districts in the 2001 plan had BVAP percentages above 54%.

The likelihood that retrogression will result from the 2002 plan is significantly less where the demographics of the districts with evidence of racially polarized voting are changed to include higher percentages of BVAP. The effect of racially polarized voting on minority voting strength is clearly dependent on the demographics of a given district. In some districts, the impact of even severely polarized voting patterns may be minimal. For example, in a district with 70% BVAP, if a substantial majority of African American voters cast their ballots for a candidate, that candidate is likely to be elected, even absent significant cross-over support from non-African American voters. In contrast, in a district with a bare majority of African American voting age population, even if a substantial majority of African Americans were to vote for a candidate, the outcome of the election is likely to be largely determined by the level of non-African American cross-over support for that candidate.

The only evidence of racially polarized voting before the court is in Senate Districts 2, 12 and 26. Under the revised Senate redistricting plan, the BVAP in Senate District 12 would remain practically the same, decreasing 0.39% from 55.43%

to 55.04%. BVAP in Senate District 2 would decrease from 60.58% to 54.5% under the revised plan, and BVAP in Senate District 26 would decrease from 62.51% to 55.45%.

The court is faced with the same evidence of racially polarized voting that it considered in reviewing the 2001 Senate plan. Despite lengthy discussion by the court of how the plaintiff might counter evidence of racial polarization in these districts, plaintiff has chosen to offer no evidence to rebut the evidence presented by Dr. Engstrom and credited by the court. Therefore, the court continues to credit the findings of Dr. Engstrom. In particular, Dr. Engstrom found levels of white support for African American candidates of choice ranging from 8.9% to 43.6%[6] in Senate elections in benchmark district 2, ranging from 10.6% to 17.5% in Senate elections in benchmark district 12, and ranging from 2.7% to 34.2% in Bibb County elections, which appears to fall within Senate District 26. U.S.Ex. 601, Table 2.

The principle of non-retrogression means that Georgia's redistricting plan may not decrease African American voters' opportunities to elect candidates of choice. However, where racially polarized voting was present in a district under the benchmark plan and the BVAP of a district does not change, we cannot say that the persistence of racially polarized voting in any way decreases overall African American voting strength. Racially polarized voting in Senate District 12 is unlikely to result in retrogression because the district's BVAP is maintained at essentially the same level under the revised plan. There is no record evidence that would suggest that a 0.39% decrease in BVAP will result in a

6. The court relies on Dr. Engstrom's calculations of white cross-over voting calculated pursuant to King's Ecological Inference.

decrease in African American voting strength in the district, or will affect the overall impact of the plan.

■ The court is left to assess the impact of the decreases in BVAPs of Senate Districts 2 and 26, given the level of racially polarized voting in those districts. The task presented is perhaps more difficult than our analysis of the previous Senate redistricting plan, where the parties created a voluminous record. Here, the State does not attempt to predict the impact of the decreases in BVAP given the evidence of racially polarized voting. Rather, Georgia simply states that the BVAP percentages in the proposed Senate Districts 2 and 26 are greater than they were in the first proposed redistricting. Defendant-intervenors, on the other hand, appear to rely on the unfounded proposition that the presence of any racially polarized voting means that a district—and hence the plan—is retrogressive.

In the absence of any record evidence that specifically addresses the predicted impact of the levels of racially polarized voting found in Senate Districts 2 and 26 on the ability of African American voters to elect candidates of choice in the redrawn districts, the court turns to other record evidence that touches on this issue.[7]

First, the court notes that, according to the election database compiled in Dr. David Epstein's report, since 1991, the African American candidate of choice won every open seat legislative election in Georgia where the BVAP was 54.00% or higher. Pl.Ex. 25. Epstein presents no

evidence of the level of racial polarization in the districts included in his database. Nevertheless, it is not insignificant that the revised Senate Districts 2 and 26 would have BVAP above 54.00%.

Furthermore, we note that our previous concerns that Senate Districts 2, 12 and 26 had BVAP percentages that placed them at the steepest portion of Dr. Epstein's "S curve," are no longer as weighty. While Dr. Epstein's analysis does not account for racially polarized voting, some level of racially polarized voting was necessarily a factor in the election results that he considered. In other words, it would appear to be a reasonable inference that, even with some level of racially polarized voting, as BVAP in a district moves progressively above a bare majority, the likelihood that an African American candidate of choice will be elected also increases. Unfortunately, given the quality of evidence, we simply can not predict with any certainty the degree to which that likelihood will increase.

### 3. Lay testimony

The United States' witnesses, residents of Senate Districts 2, 12 and 26, raised two types of concerns with the first proposed Senate plan. First, they testified that the removal of particular precincts from the districts, and the addition of others, would decrease the probability that an African American candidate of choice would be elected from the districts. Second, several of the witnesses testified that a bare majority of BVAP would not permit the elec-

---

7. Plaintiff attempts to rely on an answer by the United State's expert, Dr. Engstrom, to a hypothetical question posed by plaintiff's counsel. Dr. Engstrom testified that, in a district with 50% BVAP, where 90% of African Americans voted for Democratic candidates and 30% of white voters would "crossover" to vote for a Democratic Party candi-

date, and all African American voters cast their ballots for the same candidate, he would expect the African American candidate of choice, the Democratic Party candidate, to win 65% of the votes. *See* Tr., 2/6/02 p.m. at 141–44. However, the assumptions underlying this hypothetical are not supported by the record.

tion of an African American candidate of choice.

Several residents from Senate District 2 testified that the addition of Tybee Island, Isle of Hope and Whitemarsh areas would make it more difficult to elect African American candidates of choice because voters in those areas were predominantly white and conservative. The revised plan would remove these areas from Senate District 2, while adding majority black precincts in areas such as Garden City. Pl.Ex. 31A. In particular, Joe Murray Rivers, Chatham County Commissioner, testified that the removal of the precincts Secondary Tech, Garden City Community Center and Wilder Memorial Baptist would diminish African American electoral strength in Senate District 2. U.S.Ex. 508 ¶¶ 8–10. These three precincts are included in Senate District 2 pursuant to the revised plan. Pl.Ex. 31A. The defendant-intervenors Della Steel and Georgia Benton testified that they objected·to the Senate redistricting plan because Port Wentworth was removed from Senate District 2. Pl.Dep. Design. Tabs 3 (Benton), 27 (Steele). Port Wentworth is now contained within Senate District 2. Pl.Ex. 31A.

Several of the United States' witnesses from Senate District 12 voiced concerns that the 2001 plan for would have removed from the district Doughtery County precincts with majorities of African American registered voters. See U.S.Ex. 513, ¶¶ 24, 25 (J. White decl.); U.S.Ex. 511 ¶ 5 (A. Williams decl.); U.S.Ex. 514, ¶ 7 (W. Wright decl.). Senate District 12, as drawn in the 2002 plan, includes three such precincts. Pl.Ex. 32A (Mock Road, Turner and Albany Middle School precincts from Doughtery County). In addition, three majority white precincts, which had been included in the district proposed by the 2001 plan and which witnesses testified would diminish minority · voting

strength in the district, have been removed from the district in the revised plan.

The precincts identified by the United States witnesses as problematic in proposed Senate District 26 have also been removed in the district drawn by the 2002 plan. In particular, the predominantly rural white precincts that Albert Abrams, a member of the Board of Directors for the Macon Chamber of Commerce, argued would decrease African American voting strength, are not within the redrawn district. See U.S.Ex. 515 ¶¶ 8–9 (Abrams decl.); Pl.Ex. 33A (majority white precincts of Monroe, Butts, Jones and Jasper Counties have been removed from revised District 26); see also U.S.Ex. 519, ¶ 9 (Hart decl.) (testifying that inclusion of precincts from northern Bibb, Butts, Jones and Monroe counties would decrease likelihood that minority candidate would be elected). Majority African American precincts from Twiggs and Wilkinson Counties, which are currently within Senate District 26, would remain within the district pursuant to the 2002 plan. Burt Bivins, a member of the Bibb County Commission had identified these counties and, in particular, the City of Jeffersonville, as important areas to include in Senate District 26 to maintain minority voting strength in the district. U.S.Ex. 517, ¶ 12 (Bivins decl.).

The court places less confidence in the Senate District residents' assessment of the level of BVAP necessary to ensure that African American candidates of choice be elected. While the witnesses may obviously draw on their political experience in the districts, the court is uncomfortable with identifying any "magic number" as the level of BVAP at which it can conclude African American voting strength has not been reduced. Nevertheless, it is telling that some of the witnesses testified that the closeness of the ratio of African American

to non-African American population in the districts proposed by the 2001 plan would significantly affect minority voting strength. *See* Shinhoster dep. at 16. In the 2002 plan's proposed Senate Districts 2, 12 and 26, such bare majorities are no longer present.

### 4. Overall effect of the 2002 plan

Based on the evidence before us, we can not conclude that it is more probable than not that the 2002 plan will result in a reduction of African American voting strength. The 2002 plan decreases BVAP in the same number of majority-minority districts as did the 2001 plan. However, according to the plaintiff's methodology of calculating BVAP, the 2002 plan has thirteen districts with majority BVAP, where the benchmark plan only has twelve. While recognizing that benchmark Senate District 44 has a BVAP just under 50%, the difference of an additional district with a BVAP that is greater than 50% is not insignificant for African American voting strength.

The court, in its April 5, 2002 Opinion, was most concerned by the evidence regarding voting patterns in Senate Districts 2, 12 and 26. The evidence of racially polarized voting in these districts, in conjunction with the bare majorities of BVAP in the proposed districts, led the court to conclude that the 2001 plan was more likely than not to have a retrogressive effect.

The 2002 plan presents concerns similar to those raised by the 2001 plan. Nevertheless, the BVAP in proposed Senate District 12 is essentially the same as that in the benchmark district. Consequently, the effect of racially polarized voting in the proposed district is not likely to be any different than its current effect.

The effect of the 2001 plan on minority voting strength in Senate Districts 2 and 26 is more difficult to ascertain. The revised plan addresses district residents' concerns about particular precincts, the inclusion or exclusion of which the residents testified would negatively affect minority voting strength. Thus, the court's inquiry comes down to the question of whether racially polarized voting in the proposed Senate Districts 2 and 26 would so negatively affect African American electoral strength in those districts that the court can find that the 2002 plan would have a retrogressive effect.

We, therefore, consider the evidence of racially polarized voting in proposed Senate District 2, which has a BVAP of 54.50%, and in proposed Senate District 26, with 55.45% BVAP, in conjunction with the fact that the 2002 plan addresses district residents' concerns regarding specific precincts and the addition of a majority-BVAP district. On the basis of the evidence, we find that it is more probable than not that the 2002 plan will not have a retrogressive effect on African American voting strength in the State of Georgia.

### B. Non-retrogressive Purpose

Section 5 requires that the covered jurisdiction demonstrate by a preponderance of the evidence that the proposed voting change was not enacted with a retrogressive purpose. *Bossier II,* 528 U.S. 320, 341, 120 S.Ct. 866, 145 L.Ed.2d 845. While the plaintiff has not submitted any additional evidence other than the 2002 plan itself and the roll call of the General Assembly's vote on the plan, the court concludes that it can draw a reasonable inference from the course of events and from the nature of the changes made to Senate Districts 2, 12 and 26 that the revised plan was not created to further any retrogressive intent.

### CONCLUSION

Upon careful consideration of the entire record herein and the applicable statutory

and case law, the court finds that the State of Georgia has demonstrated by a preponderance of the evidence that the State Senate redistricting plan, Georgia Act No. 444, does not have the purpose or effect of denying or abridging the right to vote on account of race or color. Accordingly, it is hereby

**ORDERED** that plaintiff's request for a declaratory judgment pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, that the revised Senate redistricting plan, Act. No. 444, does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color or membership in a language minority group is **GRANTED.**

An appropriate Judgment accompanies this Opinion and Order.

OBERDORFER, Senior District Judge, *concurring.*

I concur in the court's opinion for substantially the reasons there stated, together with those advanced in my dissent from the court's April 5, 2002 opinion related to the state Senate.

### *JUDGMENT*

Pursuant to Federal Rule of Civil Procedure 58 and for the reasons stated by the court in its Memorandum Opinion and Order docketed this same day, it is hereby

**ORDERED** and **ADJUDGED** that the Clerk shall enter final judgment in favor of plaintiff with respect to Georgia's State Senate reapportionment plan, Act No. 444.

**IT IS SO ORDERED FOR THE THREE-JUDGE COURT.**